(No. 33122.—

FRANKLIN B. BOWES *et al.*, Appellees, *vs.* THE CITY OF CHICAGO *et al.*, Appellants.

*Opinion filed May 24, 1954.*

176

JOHN J. MORTIMER, Corporation Counsel, PHILIP A. LOZOWICK, and ROSS & O'KEEFE, all of Chicago, (JAMES A. VELDE, ROBERT J. NOLAN, RAY GARRETT, JR., JAMES G. O'DONOHUE, HARRY R. POSNER, and GEORGE J. O'GRADY, of counsel,) for appellants.

WALTER B. WOLF, EDWARD R. JOHNSTON, and THOMAS I. UNDERWOOD, all of Chicago, (PHILIP W. TONE, of counsel,) for appellees.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an appeal from an order of the circuit court of Cook County granting the plaintiffs-appellees a permanent injunction enjoining and restraining the defendants-appellants from constructing a water filtration plant in Chicago harbor. Hereafter in this opinion the parties will be referred to as they were designated in the circuit court of Cook County. The case comes to this court on appeal on the grounds that the validity of a statute, the construction of the constitution and the validity of a municipal ordinance are involved.

In the action below the plaintiffs sought to enjoin the city of Chicago from constructing a water filtration plant in Chicago harbor. The plaintiffs also sought to enjoin the Chicago Park District from consenting to such construction and to enjoin the defendant Great Lakes Dredge & Dock Co., a corporation, which had a contract with the city for some preliminary construction, from performing under said contract with the city. The water filtration plant under the proposed plans for construction was to be located in an area lying north of Navy Pier in the northerly half· of the outer. basin of Chicago harbor and of

Harbor District No. 1 of the city of Chicago, the south line of this site being a line parallel with and 400 feet north of the north line of Navy Pier. The proposed plant has an area, at the surface of Lake Michigan, of approximately 61 acres. The highest structure of the plant is to be 62 feet above the water level of the lake. The southwest corner of the proposed site is 500 feet from Lake Shore Drive and the northwest corner is 1550 feet from the drive. The indicated cost of construction is $85,000,000.

The many plaintiffs in this proceeding are grouped into four different categories: (1) a group of persons suing as citizens of the State of Illinois; (2) a group of persons suing as the owners of real estate and as taxpayers thereon, and also some fourteen of said group suing as water rate payers; (3) a group of persons, four in number, claiming to have contract and property rights that would be damaged by the construction of the filtration plant; and (4) two associations suing in furtherance of the interests of their members.

The trial court dismissed for want of equity the complaint with respect to groups (1) and (4). No appeal has been taken to this court from such dismissal. As a result of such ruling the only plaintiffs appearing in this court are those denominated as groups (2) and (3).

The group of plaintiffs suing as taxpayers are 43 separate owners of real estate in the city of Chicago, each of whom joins in this action by reason of ownership of and payment of general taxes extended against real estate located in the city of Chicago. It is contended by this group of plaintiffs that while the city proposed to build the filtration plant solely from water funds and the proceeds of waterworks certificates of indebtedness and not from general funds, the city did, however, obligate the general funds to a certain degree. The permit issued by the Secretary of the Army to the city of Chicago provided in paragraph 6 thereof, "that if future operations by the

United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy, and unobstructed; and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owner shall, without expense to the United States, and to such extent and in such time and manner as the Secretary of the Army may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable capacity of the water course." It is thus contended by this group of plaintiffs that at some future date the city may be required at its own expense to remove the entire filtration plant and restore the harbor to its original state. Moreover, the permit is to expire on December 21, 1955, and if at that time the city has not completed the filtration plant it will be required to remove all or any portion of the uncompleted structure and restore the harbor to its former condition. It is further required in the permit, by paragraph 12 thereof, that whenever commercial navigation requires and at the request of the district engineer the city of Chicago must dredge the approach channel and slip indicated on the permit. Furthermore, paragraph 13 of the permit requires the city of Chicago, when requested by the district engineer, to reimburse the corps of engineers in the amount of 25 percent of any expense involved in dredging shoals caused by accretion to the entrance channel between the gap in the outer breakwater and the lock in the mouth of the Chicago River. These plaintiffs further point out that if the water fund were large enough to

cover these expenditures, the city would be powerless to use the fund for that purpose. The Revised Cities and Villages Act expressly limits expenditures from the water fund to paying (1) the cost of maintenance and operation of the waterworks system, (2) obligations of the municipality theretofore issued that are payable by their terms from this revenue, and (3) certificates issued under certain other sections of the Revised Cities and Villages Act. (Ill. Rev. Stat. 1953, chap. 24, par. 22-28.) Clearly, therefore, expenditures made by the city, in pursuance of the above-mentioned paragraph of the Federal permit, would necessarily have to be made from the general fund of the city of Chicago. This court stated in the case of *Price* v. *City of Mattoon,* 364 Ill. 512, that taxpayers were not proper parties to question the legality of a bond issue of the city of Mattoon, issued for the purpose of buying the water system of the local utility company and to start construction of a softening and filtration plant, for the reason that the bond issue was to be financed solely out of revenue derived from the sale of water to consumers and not out of any tax or taxes levied. The court stated that the purchase under such circumstances created no liability against the general funds of the city and no special liability on the city. Therefore, inasmuch as the purchase of the supply plant in the above matter would not result in the use of the taxpayers' money, the complainants had no right to enjoin the carrying out of the ordinances as taxpayers nor did they have such right as citizens to intervene to prevent an injury to purely public rights or property when none of them suffered a special or irreparable injury different in degree and kind from that suffered by the public at large. The court further stated that even though by some unforeseen contingency arising in the future the city might be required to make up a deficiency in public funds such speculative possibility could give no comfort to those plaintiffs, for in the matter at issue neither

a debt nor a public fund of the city was directly or contingently involved.

In the situation at hand it is the general fund of the city of Chicago that is involved. Moreover, this is not a case of an unforeseen contingency arising in the future. Upon entering into the construction of any part of this filtration plant the city became liable upon all of its obligations under the Federal permit issued previous thereto, and there is a distinct foreseeable possibility that the city may be required to expend general funds in compliance with those provisions. The city has assumed an immediate and irrevocable liability by its action under the Federal permit. It is no less immediate and irrevocable because the city may conceivably never be compelled to make payments in fulfillment of some of these obligations. It is the right of a taxpayer to prevent misappropriation of public funds and the right is based upon the ground that taxpayers are considered owners of the property of the municipality, and whenever public officials threaten to pay out public funds for an unlawful purpose or to misappropriate public funds and thereby cause taxes to be levied to make good the misappropriation equity will prevent such unauthorized act. (*Dudick* v. *Baumann,* 349 Ill. 46.) These taxpayers therefore have a perfect right to seek a determination of whether the construction would be illegal and would entail a possible misapplication of general tax funds.

Fourteen of the plaintiffs embraced here in group (2) are water rate payers. They claim that as users of water for which they pay they, too, have a right to maintain the action here. The basis of their claim is that they have a special interest in the water fund of the city of Chicago because they contributed by their payment for water to that fund and have a special interest therein. They claim that if the filtration plant is constructed it will result in a substantial increase in water rates. In *Price* v. *City of Mattoon* the plaintiffs sued not only as taxpayers but also

as water rate payers seeking to enjoin the purchase of the water supply system. This court there held that as water rate payers the plaintiffs had no right to maintain the action. In that proceeding this court said, should plaintiffs as water users, aside from their status as taxpayers, fail, in the future, to pay the established water rates fixed by the city from time to time and be deprived of water, no special injury or interest was established at the time due to any apprehension or anticipation that such event will occur. An examination of the record does not disclose any allegation of water rates determined by the city. There is no failure on the part of the plaintiffs to pay any existing rate nor any threat by the city to shut off the water from their property. When and if that time comes these plaintiffs will then have their remedy at law and an injunction will not now be granted in favor of said plaintiffs which is not based upon facts showing a reasonable probable cause for apprehension. (*Joseph* v. *Wieland Dairy Co.* 297 Ill. 574.) The record here shows that the building of the filtration plant designated will not in fact cause a substantial increase in water rates more than it would were the same constructed at some other lawful place which is not disputed by the plaintiffs. In fact we are of the opinion that by the use of the funds now in the water fund and with future financing it is highly probable that the plant in question can be built without any increase in water rates. Therefore the fourteen water rate payers cannot maintain the present action as water rate payers.

Also seeking to maintain this action is that group of plaintiffs embraced in group (3), four in number, who claim to have certain contracts and property rights that would be damaged by the construction of the filtration plant. In 1889 certain enabling acts were passed by the legislature relating to the extension of Lake Shore Drive. One act authorized the extension of the driveway over

State waters and the reclamation and sale of submerged land between the driveway and the former shore. (Ill. Rev. Stat. 1953, chap. 105, pars. 125-129.) The other act granted title in the submerged land adjoining the driveway for a distance of 50 feet to the Commissioners of Lincoln Park, the predecessor of the defendant Chicago Park District.

Acting under this statutory authorization the Commissioners of Lincoln Park and the then owners of property along the shore line entered into a contract whereby the owners agreed to construct a driveway, to fill in the submerged land between the then shore line and the west line of the driveway, and to make certain payments to the park commissioners. The commissioners agreed to convey to the owners the submerged land between the driveway and the former shore line. Among other provisions the commissioners covenanted and agreed that: "no mooring of vessels to the sea wall for business purposes shall ever be allowed or shall any docks or piers be built east of said boulevard or driveway, and that if any lands are formed by accretions or otherwise east of said boulevard or driveway they shall never be used for the erection of buildings thereon, or for any purposes but those of a public park."

The nature of the legislative action, and of the agreement between the Commissioners of Lincoln Park and the property owners has been the subject of litigation previously before this court and is fully discussed in the case of *People ex rel. Moloney* v. *Kirk,* 162 Ill. 138.

Plaintiff-owners contend that since in their views section 49-11 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1953, chap. 24, par. 49-11,) requires the approval by the Chicago Park District of the plan for the filtration plant, as a condition precedent to its construction, such approval cannot be given by the defendant Chicago Park District without violation of the terms of the aforementioned agreement or covenant. The covenant, its effect and

operation, is discussed elsewhere in this opinion. It is sufficient at this time to say that the existence of the covenant and the allegation of its violation is sufficient to give the plaintiffs embraced in group (3) standing to sue. *City of Chicago* v. *Ward,* 169 Ill. 392.

Thus the only proper parties before this court and properly before the circuit court of Cook County were the group of plaintiffs designated as taxpayers and that group of plaintiffs designated as property owners. The group of plaintiffs designated as taxpayers sought to have a determination of the many questions concerning the legality of the construction of the proposed filtration plan. For instance they sought to determine the validity of a certain Federal permit, the question of the necessity of obtaining a State permit, the question of the validity of an ordinance and a provision in the Revised Cities and Villages Act which is authority for reclamation of submerged lands under the waters of this State and the use of such reclaimed land for a water filtration plant. It is the contention of these plaintiffs that such use would constitute a violation of the trust under which the State of Illinois holds title to said lands.

It is first contended by the plaintiff-taxpayers in this action that the decisions of the courts establish that the State of Illinois holds the lands under navigable waters within the State boundaries in trust for the purposes of navigation, commerce and fishing, and that the State may not grant these lands for a use which will materially interfere with these purposes. They further contend that in consideration of the public trust the legislature was without power to grant authority to the city of Chicago, or any municipality by virtue of the statute, to construct a filtration plant upon submerged land in navigable waters. Defendants counter this contention by asserting that the trust under which the State of Illinois holds submerged lands is not limited to the purposes of navigation, com-

merce and fishing, but extends to the promotion of the interest of the public and to protect the public purpose and public benefit. Upon an examination of the common law and cases in this and other jurisdictions, we are inclined to the belief that the State holds title to submerged lands subject to a trust the purpose of which is to protect all of the interests and benefits of the public in the navigable waters within the State of Illinois. It is unnecessary, however, for us to fully discuss the limits and extent of the public trust imposed upon the State of Illinois with respect to submerged lands, for the reason that whether the trust is limited as contended by plaintiffs or as broad and extensive as claimed by defendants, it is nevertheless conceded by plaintiffs in their brief filed in this court that the only question which they raise and which must be decided is whether the granting of land under navigable waters for this purpose, at this site, will materially interfere with the use of the waters for navigation. It is conceded by the plaintiffs in this court that the trust imposed upon the State of Illinois is not violated if the reclamation of these submerged lands and the construction of a filtration plant upon them will not materially interfere with the use of the waters for navigation.

The State of Illinois does own the land under the waters of large lakes within its boundaries as do other States of the union. The recent so-called "Tidelands Act" (Submerged Lands Act, Title II, sec. 3, approved May 23, 1953,) recognized and reaffirmed such title in the States. Thus large portions of Lake Michigan east of the city of Chicago are within the boundaries of Illinois and are owned by the State. Constitution of 1870, art. I.

A disposition of these submerged lands, by the State, is a question of the power of the State, acting as a governmental body. Any disposition of submerged lands within its boundaries by any State is subject always to the paramount right of Congress to control navigation upon the

waters so far as may be necessary for the regulation of commerce with foreign states and among the States of the Union. (*Illinois Central Railroad* v. *Illinois,* 146 U.S. 387.) The existence of this paramount right of Congress is not a limitation on the power of disposition by the State. So long as any disposition does not interfere with the right of navigation upon these waters no Federal question is involved. The city has obtained a permit from the Federal government granting it permission to construct a filtration plant upon these submerged lands. The validity of this permit and the extent of its application will be discussed elsewhere in this opinion.

The plaintiffs also concede that a filtration plant is for a public purpose, in the sense that the city has power to spend eligible public funds to build it in a proper place. These plaintiffs only question the location of the plant, contending that it constitutes a material interference with the navigation at this site.

For the same reason these plaintiffs assail section 49-11 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1953, chap. 24, par. 49-11,) as invalid. That statute states: "For the purpose of constructing water purification plants and acquiring or constructing wharves, piers, docks, levees, or in connection with wharves, piers, docks, levees, elevators, warehouses, vaults, or necessary and appropriate tracks or terminal facilities, any municipality may reclaim the submerged land under any public waters within the jurisdiction of or bordering upon the municipality, and thereupon shall be vested with the absolute title, in fee simple, to the land so reclaimed. For any of these purposes the municipality may acquire, by purchase, condemnation or otherwise, the title of private or public owners to land lying beneath those public waters, and also the riparian or other rights of the owners of the shore land abutting on those public waters, or in or over those public waters, or the submerged land under those waters; * * *." Plaintiffs

assert that if this section is construed to apply to land under navigable waters and to authorize the construction on such land of a plant which would materially interfere with navigation and commerce, then it is clearly beyond the power of the legislature, as this court has repeatedly defined that power. However, plaintiffs again concede that if this statute is construed to authorize only such reclamation and construction as will not materially interfere with navigation and commerce, then section 49-11 is not invalid.

We are thus brought to a consideration of the second contention raised by these plaintiff-taxpayers, the determination of which will be decisive of the questions above presented.

It is asserted by the plaintiff-taxpayers that the construction of the proposed filtration plant at the approved site in the Chicago harbor would materially interfere with navigation in the waters of Lake Michigan and within the harbor area. It is not every possible interference with navigation upon the waters of Lake Michigan and the harbor area that is condemned, but it is only substantial material interference or obstruction with practical navigation upon the lake which is to be protected against. *Illinois Central Railroad* v. *Illinois,* 146 U.S. 387; *People* v. *Kirk,* 162 Ill. 138.

While we have found above that the public trust residing in the State government of Illinois is to protect all those rights and benefits of the people of the State of Illinois in the navigable waters within the boundaries of the State, including the right of navigation, it is nevertheless the paramount right of the Federal government to protect the navigability of these waters. Here the Secretary of the Army has issued a permit to the city of Chicago granting the city the right to construct a filtration plant upon submerged land in Lake Michigan within the harbor area. This permit was issued only after the chief of engineers had fully inspected the plans for the project

and its relation to commerce and navigation in the vicinity. Complete plans for the proposed construction as well as maps and diagrams of the immediate harbor area and the entire lake shore of the city of Chicago were submitted to the chief of engineers and studied by him. Extensive hearings were held by the Army engineers, and as a result of those hearings it was recommended that the Secretary of the Army issue a permit after finding that the construction of the filtration plant as proposed and approved by the Federal department would not materially obstruct navigation within the harbor area.

We have reviewed the evidence presented in the record and find that it fails to show the construction of the proposed filtration plant will amount to a substantial interference with navigation in this immediate area. It is indicated that in the past the area of the harbor north of Navy Pier, where the plant is to be located, has been little used by vessels traversing Lake Michigan and this harbor. In fact there has been little navigation at all within this area of the harbor. It is further shown that after the construction of the proposed plant there will remain just as many facilities for mooring vessels as was previously afforded. Adequate freeway will remain to permit vessels entering the north entrance of the harbor to proceed into any part of the harbor area. The construction of the filtration plant, as indicated, will provide even more facilities for vessels than existed prior thereto in the harbor area. It is provided by the Federal permit that the city authorities in constructing the filtration plant must provide a slip and wharfing facilities along the south boundary of the reclaimed property. This slip will provide all-weather mooring facilities permitting substantially greater protection from the elements than previously existed in the north area of the Chicago harbor. Plaintiffs offered extensive expert testimony that the construction of this filtration plant will materially interfere with future navigation in the Chicago

harbor for the reason that it will occupy an area where piers might be built to handle a purported increase in lake traffic. It is at least questionable whether the area would be accessible to the required means of transportation necessary to commercial piers and wharfs, and whether this immediate area is the best place for pier and wharf facilities in the Chicago area. Almost all of the evidence presented by the plaintiffs is speculative in nature and based on little fact, if any. The Chicago harbor is admittedly an artificial harbor. The Chicago shore line on Lake Michigan is quite extensive and nothing in the record indicates that harbors constructed in the same manner as the existing Chicago harbor could not be constructed along any part of the Chicago lake front.

It is urged that the city council has abused its discretion in selecting the site of the filtration plant for the reason that it would interfere with navigation. The city has been entrusted, as a branch of the State government, with the power to construct filtration plants upon submerged lands within the State's boundaries and in close proximity to the city, and as a corollary thereto exercises the State's discretion in protection of the public trust. The site selected is within the boundaries of the State of Illinois upon submerged lands, and within the area granted to the city of Chicago. However, before the selection of this site by the city of Chicago the consulting engineers had made their report to the city council, the council's finance committee had considered the matter fully and held a public hearing thereon, the commissioner of public works had filed his report as approved by the engineers, and the finance committee had recommended the site. After the Secretary of the Army had issued the Federal permit for the site pursuant to the Army's corps of engineers' hearing on the matter, the city council reaffirmed its earlier actions by accepting the conditions of the Federal permit. Having found that the actual site selected does not amount to a

substantial interference with navigation, and in considera-
tion of the extensive investigation conducted by various
officers, employees, and committees of the city government,
we cannot say that the city of Chicago abused its discre-
tion in selecting this site. The city has selected the least
costly of all of the proposed sites, one which is centrally
located and very near the largest water intake tunnel. Its
construction in this location will not require expensive con-
demnations and associated dislocations and inconveniences
to the public inherent in other proposed sites. The city
has exercised its discretion in a manner devoid of the taint
of arbitrary and capricious action and in consideration of
the general public welfare. The legislative judgment is
conclusive unless the ordinance is shown to be arbitrary,
capricious and unrelated to the public good. (*Jacobson* v.
*Village of Wilmette,* 403 Ill. 250; *Father Basils Lodge,
Inc.* v. *City of Chicago,* 393 Ill. 246.) The ordinance
selecting this site is thus presumptively valid. It is the
considered opinion of this court that the construction of
the municipal water filtration plant upon the submerged
land at the site selected will constitute no material sub-
stantial interference with navigation whatsoever.

Plaintiff property owners who appear here as group (3)
claim a violation of certain covenants by the Chicago Park
District board in its failing to disapprove of and prevent the
reclamation of these submerged lands at the site proposed
and the erection of a filtration plant thereon. We have
above discussed the act of the legislature which authorized
the extension of a driveway over the submerged lands
underlying the waters of Lake Michigan and the reclama-
tion and sale of those submerged lands lying between the
driveway as constructed and the former shore. Another
act granted title in the submerged lands adjoining this
driveway for a distance of 50 feet east of the driveway to
the Commissioners of Lincoln Park. This act also pro-
vided that the Commissioners of Lincoln Park and their

successors in office might have and exercise police power over the waters of Lake Michigan along the east side of this driveway and an extension thereof, for a distance of 250 feet, in the same manner as police power is exercised over the grounds of the park. In authorizing the construction of this driveway it is provided by the legislature that when a park board shall determine to extend a boulevard or driveway connected with any public park, it should prepare a plan and estimate "and shall obtain the consent in writing of the owners of at least two-thirds of the frontage of all of the lands not appropriated to or held for public use abutting on such public waters, in front of which it is proposed to extend such boulevard or driveway * * * the riparian or other rights of the owners of land on the shore adjoining the waters in which it is proposed to construct such extension, the said board of park commissioners may acquire by contract with or deeds from any such owner; and in case of inability to agree with any such owner, proceedings may be had to condemn such rights according to the provision" of article IX of the Cities and Village Act then in force.

Acting under this statutory authorization the Commissioners of Lincoln Park and the then owners of property along the shore line entered into a contract wherein the property owners agreed to build a breakwater and fill for the boulevard driveway and to fill in the submerged land between the then shore and the boulevard, and to make certain payments per front foot to the Commissioners of Lincoln Park. In consideration of the above the commissioners agreed to convey to the owners the submerged land between the driveway and the former shore line, to maintain the boulevard, and covenanted: "That no mooring of vessels to the sea wall for business purposes shall ever be allowed, nor shall any docks or piers be built east of said Boulevard or Driveway, and that if any lands are formed by accretions or otherwise, east of said Boulevard

or Driveway, they shall never be used for the erection of buildings thereon, nor for any purposes but those of a public park."

Shortly thereafter the property owners conveyed their riparian rights and their title to the land occupied as a boulevard or driveway to the Commissioners of Lincoln Park by a deed which recited that the conveyance was "upon the further condition that the riparian rights herein granted and conveyed to the second party [Commissioners of Lincoln Park] shall never be used otherwise than for park purposes, and that the lands which may be formed by accretion or otherwise contiguous and belonging to the shore of said lake, thus formed, and made by said boulevard or driveway, shall never be used for the erection of buildings thereon, or for any purposes but those of a public park, * * *."

Thereafter in 1896 the Commissioners of Lincoln Park deeded to the owners of property along the former shore line the reclaimed submerged land between the driveway and the former shore. The consideration recited in this quitclaim deed was "the performance of the work so contracted for." (In reference to the construction of a driveway by the 1891 shore owners, in exchange for which they obtained this conveyance of the intervening submerged land.)

The nature of the legislative action, the agreement between the Commissioners of Lincoln Park and the property owners, and other aspects relating to the extension of Lake Shore Drive, constituted the subject of litigation previously before this court, which was fully discussed in the case of *People* v. *Kirk,* 162 Ill. 138, wherein the driveway project was sought to be enjoined by the Attorney General, and relief was denied.

It is contended by the property owners, that since in their view, section 49-11 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1953, chap. 24, par. 49-11,) requires

the approval by the Chicago Park District of the plans for the filtration plant as a condition precedent to its construction, such approval cannot be given by the defendant Chicago Park District without a violation of the terms of the aforementioned agreements or covenants. This section of the statute requires that "where any park district holds land abutting upon the shores of Lake Michigan adjacent to the submerged land intended to be reclaimed for the purpose of constructing water filtration plants, the approval of a plan by such park district showing the boundaries of the submerged land to be reclaimed and the character of buildings and structures to be erected thereon shall first be obtained prior to the reclamation of such submerged land by any municipality."

The act authorizing the construction of this boulevard driveway gave the commission authority to contract and to reach an agreement with the property owners abutting the lake shore. The act thus contemplated the giving of some consideration and a meeting of minds on related points necessary to the execution of a contract or agreement. Certainly, the commission had a right to make any covenant in the interest of obtaining these riparian rights which did not violate the public interest or the purpose to be accomplished under the act. Having the right to contract for the construction of the boulevard and the right to convey the submerged land between the lake shore and the boulevard to defray the construction costs, without doubt the commissioners had full authority to contract and hence to enter into any reasonable covenant in regard to the conveyance of these lands and the securing of these riparian rights.

While covenants are generally created by deed, they may be created by a contract not involving the transfer of title to land, if consideration and other essentials of a contract are present. (14 Amer. Jur. 610, Covenants, Conditions, and Restrictions.) The Commissioners of Lin-

coln Park constituted a municipal corporation organized for the purpose of creating, improving, and maintaining a system of parks, boulevards, and driveways, and their powers and authority in these respects were plenary. *People ex rel. Hoyne* v. *Chicago Motor Bus Co.* 295 Ill. 486.

At the time the contract containing the original covenant was executed the Commissioners of Lincoln Park had the right to acquire title to only the driveway area as extended, the title to submerged land for 50 feet east of the driveway, and were given police power over an additional 250 feet of the waters of Lake Michigan contiguous to the new shoreline. The commissioners had no title to submerged land beyond a point 50 feet east of the driveway nor did the commissioners have any power over any of the submerged lands or the waters east of a point 250 feet east of the driveway as extended. Therefore the commissioners could only covenant with respect to that property over which they exercised control or to which they could claim title. If a liberal construction is granted the covenant contained in the contract as contended by plaintiff, then the contract was intended to and did create a right to have no buildings erected far out in the lake, the word "east" asserting a right in the commissioners to prevent the erection of buildings eastward from the driveway to an undescribed limit. Certainly there was no intention and without doubt no power in the Commissioners of Lincoln Park to covenant to prevent the erection of buildings beyond the limits of the area under their control.

This court in considering the effect to be given restrictive language found on plats of the area in Chicago immediately east of Michigan Avenue, and now known as Grant Park, reading: "Public ground—forever to remain vacant of buildings" and "open ground—no buildings," determined that it was the intention and purpose of the dedicators and the legal effect of the dedication to restrict the surface of the tract so as to prohibit the erection of build-

ings thereon for whatever purpose. (*City of Chicago* v. *Ward,* 169 Ill. 392; *Bliss* v. *Ward,* 198 Ill. 104; *Ward* v. *Field Museum,* 241 Ill. 496; *South Park Comrs.* v. *Ward & Co.* 248 Ill. 299; *Michigan Boulevard Building Co.* v. *Chicago Park Dist.* 412 Ill. 350.) We there held that these restrictions were applicable to the specific property dedicated and the submerged land later reclaimed and abutting directly upon the original dedication, but to no other.

It was determined in the *Chicago Yacht Club* cases (*McCormick* v. *Chicago Yacht Club,* 331 Ill. 514; *Stevens Hotel Co.* v. *Chicago Yacht Club,* 339 Ill. 463,) that the privilege granted by the dedication of the park to the abutting lot owners was only that the public grounds should remain forever vacant of buildings, and that buildings constructed outside of the park area upon submerged land not immediately abutting the park shore would not be violative of the provisions contained in the dedication. Hence it was held that the erection of a Yacht Club building on submerged land in the harbor and not abutting the park did not violate the provisions. In the instant situation, the broad language of the covenant contained in the contract, if followed literally, would apparently have application to lands east of the park driveway without limit and over which the commissioners of the park have no control. The submerged lands at the chosen site of the proposed filtration plant lie entirely outside of the area over which the park district may claim control. For the covenant to have effect it must be construed to be applicable only to the lands over which the Commissioners of Lincoln Park have control, either by reason of ownership or by reason of the delegated police power.

We do not believe, however, that the broad covenant contained within the contract between the Commissioners of Lincoln Park and the property owners can be construed in its application without reference to the covenant contained in the quitclaim deed executed by the property

owners in conveying their riparian rights to the Commissioners of Lincoln Park.

This court is inclined to agree with the statement concerning the contract and the deed of riparian rights made by the trial court as a finding in its decree. That finding states "a contract between the Commissioners of Lincoln Park and the shore owner and the conveyance referred to in finding (XIV) and other previous findings together constitute one transaction and must be read and interpreted together." The conveyance referred to in finding (XIV) is the instrument wherein the shore owners quitclaimed their riparian rights to the Chicago Park District. As noted above the covenant contained within that deed specifically. limited the park district's obligation to prevent the erection of buildings to the park property and "lands which may be formed by accretion or otherwise contiguous and belonging to the shore of said lake, thus formed, and made by said boulevard or driveway." The contract and the subsequent quitclaim deed of riparian rights constituting, under the authorizing acts, one transaction, and reading and interpreting those instruments as one transaction, we arrive at the conclusion that the covenant contained in the deed necessarily restricts the broad applicability of the covenant contained in the contract. The covenant of the deed is itself broad enough to cover all that area to which the park district, at the time of the transaction, might claim title or control. The deed describes the land on which building restrictions were forbidden in greater detail and to a degree more consonant with the authority and title possessed by the park district. Being later in time, in effectuation of the contract, and in relation to and a part of the one transaction, the deed necessarily restricts or limits the covenant of the contract.

The riparian rights of a shore owner have been defined as the right of accretion and right of access to the water from the land. (*Miller* v. *Com'rs of Lincoln Park*, 278

Ill. 400.) By this quitclaim deed the park district acquired the right to accretions to the park district property and shore line and the right of access to the water. It was undoubtedly the purpose of the parties in the execution of the quitclaim deed of these riparian rights to assure the property owners that the park district property would never be used for the construction of buildings which would deny to these property owners their view of the lake, that the riparian rights granted to the park district and the accretions to the park district property would never be used for other than park purposes. The covenant contained therein, providing an interpretation of the covenant contained in the previous contract, gives to that covenant a certain and definite meaning and ascribes to it certain limits of applicability entirely consonant with the power and authority of the park district and effectuates the obvious intention of the parties. Certainly there could be no intent or design on the part of the commissioners of the park district to promise or assert an authority beyond their power to exercise.

The site of the proposed reclamation of submerged land is located, at its southern extremity, more than 300 feet east of the easternmost point of accretions to the park district property. That point is the shortest distance between the area to be reclaimed and any part of park district property. At the northern extreme of the area to be reclaimed the distance between park district property and the submerged area is 1550 feet. It is thus seen that the entire area proposed to be reclaimed is beyond the property to which the park district claims title, beyond the 250 feet of water east of the park district over which the district has police power, and does not abut nor is it closely adjacent to any park district property. Consequently, the reclamation of this submerged land and the construction of a filtration plant thereon can constitute no

violation by the park district of its covenant with the prop-
erty owners.

It is next contended by plaintiffs that section 49-11
provides that the city must first obtain the approval of the
Chicago Park District before it may reclaim submerged
land adjacent to the park district's shore-line property and
construct a filtration plant thereon. It is provided in sec-
tion 49-11 of the Revised Cities and Villages Act that
"For any of these purposes [those purposes set forth in
the section] the municipality may acquire, by purchase,
condemnation or otherwise, the title of private or public
owners to lands lying beneath those public waters, and
also the riparian or other rights of the owners of the
shore land abutting on those public waters, or in or over
those public waters, or the submerged land under those
waters; provided, however, that where any park district
holds land abutting upon the shores of Lake Michigan
adjacent to the submerged land intended to be reclaimed
for the purpose of constructing water filtration plants,
the approval of a plan by such park district showing the
boundaries of the submerged land to be reclaimed and
the character of buildings and structures to be erected
thereon shall first be obtained prior to the reclamation of
such submerged land by any municipality." The Chicago
Park District does not have any title to the waters or the
submerged land at the proposed site of the filtration plant.
The only rights residing in the park district which might
be interpreted as incorporated under the provisions of this
act are the riparian rights of the park district property
abutting the shore line and the police power of the park
district extending for 250 feet east of the park district
property over and upon the waters of Lake Michigan. We
have demonstrated above that no part of these submerged
lands proposed to be reclaimed lies within the limits of
park district police authority. The park district's riparian

rights have been shown to be the right to accretions to the shore line and the right of access to the waters of the lake. The submerged land to be reclaimed will not abut upon park district shore-line property nor will it be an accretion thereto. Thus the riparian rights of the park district will not be affected by the reclamation of these submerged lands.

It is asserted, however, by plaintiffs that wherever submerged lands to be reclaimed are adjacent to park district shoreline property it becomes necessary for the city or municipality reclaiming those lands to obtain the approval of the park district. It is thus necessary for us to construe the meaning to be attached to the word "adjacent" as used in the proviso of section 49-11. "Adjacent" is defined in Webster's New International Dictionary, Second Edition Unabridged, as meaning "lying near, close, or contiguous; neighboring; bordering on; as, a field adjacent to the highway." Synonyms for "adjacent" cited by the same works are "nigh, juxtaposed, meeting, and touching." It is stated in the case of *People ex rel. Sackmann* v. *Keechler*, 194 Ill. 235, that "The word 'adjacent' is defined by Webster and other lexicographers to mean, 'to lie near;' 'close, or contiguous.' It is sometimes said to be synonymous with 'adjoining,' 'near,' 'contiguous.' In some decisions courts have held it to mean 'in the neighborhood or vicinity of;' in other 'adjoining or contiguous to.' [Citations.] * * * It has no arbitrary meaning or definition. Its meaning must be determined by the object sought to be accomplished by the statute in which it is used. This consideration manifestly controlled each of the courts in the interpretation placed upon the word in the cases cited." In *Husser* v. *Fouth*, 386 Ill. 188, "adjacent" was held to be synonymous with "contiguous" in a school case wherein a statute required the territory to be "compact, contiguous, and adjacent." This same case further said that words in statutes should be given their com-

monly accepted meaning unless otherwise defined by the legislature.

In a case determining the validity of an ordinance for the construction of sidewalks, the ordinance was found to be fatally defective for failing to specify the location of the sidewalk. The ordinance merely required that the sidewalk be "adjacent" to the curb. "Adjacent" was found to mean either lying near, close or contiguous. Objects were found to be adjacent when they lie close to one another, but not necessarily in contact. *City of Dixon* v. *Sinow & Weinman*, 350 Ill. 634.

We are thus directed by case law in the State of Illinois to apply to words appearing in legislative enactments their common dictionary meaning or commonly accepted use unless otherwise defined by the legislature, the specific meaning being determined by the object sought to be accomplished by the statute in which they are used. It is clear that the object of the proviso contained in section 49-11 was for the purpose of protecting the riparian and other rights of the park district owning the shore-line property and the use of that property for park purposes. The commonly accepted dictionary definition of "adjacent" and the common use of that word may clearly be attributed to it as the meaning implied by proviso of this statute. The submerged property to be here reclaimed must therefore lie close or near, or even contiguous or bordering upon, property of the park district in order to require the park district's approval of the proposed reclamation. We have previously determined herein that the reclamation of the submerged land at the proposed site of the filtration plant will not materially interfere with the riparian rights of the park district. It would constitute a strained application of the common meaning and usage of the word "adjacent" to determine that the proposed reclamation is so closely adjacent to the park property as to deny or adversely affect the use of that park property for park purposes. We are

of the opinion that in this situation it was not incumbent upon the city of Chicago to obtain the approval of the Chicago Park District in order that it might validly proceed with the reclamation of the submerged land and the construction of the filtration plant thereon.

The Chicago Park District by resolution of its board of commissioners has determined that "the proposed construction of said filtration plant in the above described area will not adversely affect the interests of the Chicago Park District." Thus, the Chicago Park District has, in its discretion, determined that its park property will not be adversely affected by the construction of the filtration plant. This resolution was passed, not at the request of the city of Chicago, but at the request of the United States Army and the Illinois Division of Waterways. However, were such approval by the Chicago Park District required by the provision of the statute, this resolution would meet the requirements of that act.

These plaintiffs also maintain that the city lacked valid authority to proceed from either the Federal or the State governments. In this connection it is urged that the permit issued by the Secretary of the Army is invalid, for the reason that the structure permitted is obviously an obstruction in an established public harbor and admittedly constructed for a purpose having no connection with navigation or commerce. The power to change, alter or obstruct navigable waters over which Congress has assumed jurisdiction is not acquired until the consent of the Federal government has been obtained thereto, and whether or not such consent is obtained has been held to be not merely a question between the Federal government and the party erecting such structure or making a change, but is a question for one whose property is affected thereby. (*Department of Public Works and Buildings* v. *Engel,* 315 Ill. 577.) Here the city of Chicago proposes to build a filtration plant within the harbor area in Lake Michigan adjacent

to the city of Chicago. A permit had been obtained from the Federal government. Pursuant to that permit, however, the city of Chicago has become liable upon possible future foreseen liabilities in connection with the construction and alteration of this filtration plant, and the maintenance of the surrounding harbor area. Since such contracted liability will be a drain upon the general fund of the city of Chicago, it is the property of the taxpayers which will be directly affected. The taxpayers consequently may question the validity of the Federal permit.

In the case of *Wisconsin* v. *Illinois,* 278 U.S. 367, the Chief Justice in explaining the function of the permit of the Secretary of War (now Secretary of the Army) in the statutory scheme said: "The true intent of the Act of Congress was that unreasonable obstructions to navigation and navigable capacity were to be prohibited, and in the cases described in the second and third clauses of section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction." The Secretary of the Army may therefore permit such structures to be erected upon submerged lands underlying navigable waters as do not unreasonably interfere with the navigable capacity thereof. We have already determined that the reclamation of these submerged lands and the erection thereon of this municipal filtration plant does not constitute a material, substantial, or unreasonable obstruction to navigation.

It is not necessary that structures erected upon submerged lands under navigable waters be necessarily in aid of navigation. Many structures such as automobile and railroad bridges, oil and pipe-line crossings, and electric transmission lines, to name but a few, constitute no aid to navigation. At the same time they do not constitute unreasonable obstructions to navigation and are within the power of the Secretary of the Army to permit. This per-

mit, issued on the recommendation of the chief of engineers after thorough investigation and exhaustive hearings, is not invalid as beyond the discretion of the Secretary of the Army.

These same taxpayers finally contend that the reclamation of these submerged lands and the erection of the filtration plant thereon is illegal for the reason that the city of Chicago failed to obtain a permit from the Department of Public Works and Buildings of the State of Illinois for the construction of this plant. It is provided by section 18 of the act of 1911 in relation to regulation of rivers, lakes and streams, (Ill. Rev. Stat. 1953, chap. 19, par. 65,) that "It shall be unlawful to make any fill or deposit of rock, earth, sand, or other material, or any refuse matter of any kind or description, or build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure, or to do any work of any kind whatsoever in any of the public bodies of water within the state of Illinois, without first submitting the plans, profiles, and specifications therefor, and such other data and information as may be required, to the Department of Public Works and Buildings of the State and receiving a permit therefor signed by the Director of said department and authenticated by the seal thereof; * * *." It is thus seen by this section that it is declared unlawful to do any work in the public waters of the State without first obtaining a permit from the Department of Public Works and Buildings. However, section 49-11 of the Revised Cities and Villages Act, the statutory authority for the construction of this municipal filtration plant, authorizes a municipality to construct water purification plants and reclaim submerged land under any public bodies of water within the jurisdiction of or bordering upon the municipality provided that the plan for the construction be approved by the park district if the district holds land abutting upon the shores of Lake Michigan

adjacent to the submerged land intended to be reclaimed. Section 18 of the act above referred to was enacted into law in 1911, whereas section 49-11 of the Revised Cities and Villages Act was amended in 1949 to specifically authorize a municipality to construct water filtration plants and reclaim submerged land as therein provided. Section 18 is an act of general application, whereas the amendment to section 49-11 is a specific provision. Where there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates only to one subject, the particular provision must prevail and must be treated as an exception to the general provision, especially where the particular provision is later in time of enactment. (*People ex rel. Atwell Printing and Binding Co.* v. *Board of Comrs.* 345 Ill. 172; *People ex rel. Fere* v. *Missouri Pacific Railroad Co.* 342 Ill. 226.) The provision of section 49-11 is obviously an exception to section 18 of the prior act. The legislature having given specific permission to the city to construct the water filtration plant upon submerged lands within the jurisdiction of or adjacent to the boundaries of the city, it is not required that the city obtain a permit from the Department of Public Works and Buildings in order to proceed with the construction thereof pursuant to the provisions of section 18.

Several other issues are raised by the parties to this proceeding, but in view of our determination of the above questions it is unnecessary for this court to consider them. All the questions considered have been determined adversely to the plaintiffs. The construction of the filtration plant will not violate the public trust nor materially interfere with navigation, and section 49-11 of the Revised Cities and Villages Act and the ordinance of the city of Chicago authorizing the construction of the plant at this site are valid. The Chicago Park District has not violated its covenant with the plaintiff property owners, nor was

it necessary that it approve the plans for reclamation of these submerged lands and the construction of this filtration plant. A valid Federal permit has been acquired by the city and it was unnecessary for the city to procure a permit from the Illinois Department of Public Works and Buildings. For these reasons the decree of the circuit court of Cook County is necessarily reversed and the cause is remanded to that court, with directions to dissolve the injunctions restraining and enjoining the city of Chicago, the Chicago Park District and the Great Lakes Dredge & Dock Co., from proceeding with any actions in relation to the reclamation of these submerged lands and the construction of a filtration plant thereon.

*Reversed and remanded, with directions.*