Charles R. Barrett, Catherine M. Barrett, S. A. Healy Company and M. J. Boyle & Company, Appellants, v. City of Chicago, John F. Ward, as Purchasing Agent of City of Chicago, Richard J. Daley, as Mayor of City of Chicago, Carl H. Chatters, as Comptroller of City of Chicago, Grafe-Callahan Construction Company, Tecon Corporation, Mittry Constructors and Johnson, Drake & Piper, Inc., Appellees.

Gen. No. 46,883.

First District, Second Division.
June 26, 1956.
Released for publication September 11, 1956.

Lloyd D. Heth, Daniel M. Healy, and John J. Flynn, all of Chicago, for appellants.

Concannon, Dillon & Snook, of Chicago, for Grafe-Callahan Construction Company, Tecon Corporation, Mittry Constructors, and Johnson, Drake & Piper, Inc., certain-appellees; William H. Dillon, of Chicago, of counsel. John C. Melaniphy, of Chicago, Corporation Counsel of City of Chicago, for City of Chicago, John F. Ward, Richard J. Daley and Carl H. Chatters, appellees.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

A complaint was filed in the Circuit Court of Cook county by the plaintiffs, as taxpayers, against the City of Chicago and certain of its officers, and Grafe-Callahan Construction Company, Tecon Corporation, Mittry Constructors and Johnson, Drake & Piper, Inc. (hereafter referred to as the Grafe group), to have declared illegal and void a contract entered into between the City of Chicago and the Grafe group for the construction of water tunnels and shafts constituting a part of the New Central District filtration plant to be erected north of the Municipal Pier in Lake Michigan, and for a permanent injunction restraining the city from performing the said contract. The defendants filed motions to strike and dismiss which were sustained. The complainants, who are Charles R. Barrett, Catherine M. Barrett, and two unsuccessful bidders for the contract, the S. A. Healy Company and M. J. Boyle & Company (hereinafter referred to as the Healy group), elected to abide by their amended bill and a decree was rendered dismissing the bill for want of equity at plaintiffs' costs, from which decree plaintiffs take this appeal.

The material allegations in the amended complaint germane to this decision are that the plaintiffs are owners of real estate and taxpayers in the City of Chicago; that the City of Chicago has for many years past

148

owned and operated a water works and water distribution system by means of which it supplies water to householders and businesses located in and adjoining the City of Chicago and that for such services it charges water rates which are kept in a certain water fund; that such funds are used to pay the cost of operating, maintaining, extending and improving the said water system; that waterworks certificates of indebtedness and water revenue bonds are issued for such extensions and improvements, the principal and interest on which are paid out of the said fund; that by an ordinance passed on November 29, 1949 the City of Chicago selected as the site for the proposed Central District filtration plant an area in the Chicago harbor, which location is under the jurisdiction of the United States of America as to any structures to be constructed thereon; that on January 19, 1951 a permit was issued by the Secretary of the Army to construct the said filtration plant (which permit was attached to the complaint as an exhibit); that as a part of the construction of the filtration plant it was necessary to construct underground tunnels and vertical shafts, which vertical shafts will be built within the confines of a cofferdam, the construction of which is not involved in this suit; that the shafts when completed will constitute an integral and indispensable part of the said filtration plant; that the filtration plant and the government permit are the same as those involved and described in Bowes v. City of Chicago, 3 Ill.2d 175.

It is further alleged that on April 18, 1955 the purchasing agent of the City of Chicago advertised for bids for the construction of said tunnels and shafts and pursuant to such advertisement the city furnished sets of specifications and contract documents relating to the three sections upon which prospective bidders were required to submit their bids and which, if accepted and executed, would constitute the contract;

149

that the specifications and contract documents called for lump sum bids on certain material to be furnished and work to be done, and for unit bids on other portions thereof, and particularly called for a unit price bid per million gallons for pumping water from the tunnels and shafts; that the amount of water to be pumped was estimated in the specifications as a total of 39 million gallons for the three sections, and the specifications further state that the unit price set by the contract was to apply whether the actual quantities are greater or smaller than the assumed quantities; that the assumed quantities are approximate and in general exceeded the Commissioner's estimate and are inserted solely for the purpose of enabling the city to canvass the bids and determine the amount of the performance bond; that the bidder should visit the site and familiarize himself with the physical conditions in the vicinity of the work; that there were in the office of the Commissioner records of borings which had been made, together with materials taken therefrom, as well as a laboratory analysis of the soil; that there was also in the office of the Commissioner information with respect to previous waterwork and tunnel construction performed by the city; that the "bidder must form his own opinion of the character of the materials to be excavated and put his own interpretation upon the borings made by the City, or make such other investigations as he may deem necessary for the calculation of his bid"; that the contract documents and specifications contained a provision that within 60 days after the opening of the proposals the purchasing agent will accept in writing one of them or will reject all, and that "unbalanced bids and bids embodying prices plainly below the cost for which the work can be done or for which materials can be furnished may be rejected"; that in response to the advertisement for bids the purchasing agent received sealed bids from a number of

"competent and responsible bidders," including the Grafe group, the Paschen group, and the Healy group; that the bids were opened on June 10, 1955 and a tabulation thereof prepared by the city; that from the tabulation it would appear that the Grafe group is the lowest bidder, the Paschen group the second and the Healy group the third lowest.

The complaint also alleged that the engineers in preparing the plans and specifications for the city had erred in estimating a total pumpage of 39 million gallons, whereas the proper pumpage was a minimum of 900 million gallons; that the city, its purchasing agent and each of the bidders knew or by the exercise of reasonable care should have known that fact; that pumpage such as required to be performed can be performed at a profit at a unit price of $500 per million gallons; that the Grafe group submitted a unit price of $2,000 per million gallons, the Paschen group a unit price of $5,000, and the Healy group a unit price of $500 per million gallons, the latter two based on the award to them of the construction of all three sections involved; that under a proper minimum estimate of pumpage of 900 million gallons the Healy group would have been the lowest bidder and should have been awarded the contract; that subsequent to the opening of the bids prior to the award of the contract the Healy group, through its attorney, notified the purchasing agent of the City of Chicago of the discrepancy in the estimated pumpage and pointed out the minimum pumpage to be expected was 900 million gallons and that the Healy group was therefore the lowest bidder, which notice was attached to the complaint as an exhibit; that on information and belief the engineer employed by the Department of Public Works in the City of Chicago under whose supervision and direction the specifications were prepared rechecked the estimated pumpage and reported to the Commissioner of

151

Public Works and the purchasing agent that the estimates of the total of 39 million gallons were in error and that such pumpage would be at least ten times that much, or 390 million gallons, and that under such estimate the Healy group would still be the low bidder; that the City of Chicago and its purchasing agent permitted the Grafe group to amend its bids after the same had been submitted and opened and before the contracts were awarded, by changing the unit price for pumpage from $2,000 per million gallons to $2,000 per million gallons for the first 39 million gallons "and actual cost, or $400 per million gallons, whichever was less, for the remaining pumpage, and said change in bids was embodied in a supplemental agreement," a copy of which is attached to the complaint and made an exhibit; that the city awarded the contracts for the three sections to the Grafe group; that under the contracts awarded the City of Chicago, unless restrained by injunction, will disburse more than $13,000,000 "out of the Water Fund of the City of Chicago, or out of the proceeds of the sale of Water Works Certificates of Indebtedness, the principal of which, together with interest thereon, must be paid out of said Water Fund"; that the city, in spite of the fact that the contract documents and specifications provided "payments for the work will be made from the Water Fund or from funds obtained from the sale of Water Works Certificates of Indebtedness," nevertheless has obligated its general fund inasmuch as the permit issued by the Secretary of the Army provides that if future operations by the United States require alteration in the position of the structure or work authorized, or if in the opinion of the Secretary of the Army it shall cause unreasonable obstruction to free navigation of the said water, the city will be required, upon due notice, to remove or alter the structural work or obstructions caused thereby at its own expense, and that these expenses, if incurred, must be paid from the general

funds of the City of Chicago and thereby the city has assumed an "immediate and irrevocable liability, payable out of its general funds, by commencing under the terms of said permit the construction" of said filtration plant, of which the work to be done under the contract documents and specifications here involved constitutes an integral and indispensable part.

The plaintiffs prayed that the court may adjudge and decree that the Grafe group is not the low bidder and is not entitled to be awarded the contracts in question; that the court adjudge that the action of the purchasing agent permitting the amendment of the Grafe group bid after bids were opened is illegal, fraudulent and void, and that no contracts be awarded thereupon; that a permanent writ of injunction issue to the defendants City of Chicago, et al., restraining them from executing a contract or contracts with the Grafe group for the work above described or any part thereof under the advertisement and bids above described, or if said contracts have been executed, from performing such contracts, or any part thereof, and "in particular from expending any sums of money from the Water Fund, or from the sale of Certificates of Indebtedness payable out of said Water Fund, by reason thereof."

The City of Chicago and its officers and the Grafe group moved to strike the complaint and dismiss the cause, and set up in their amended motions as grounds, among others, that the public improvement to be constructed is to be paid for solely out of revenue derived from the sale of water to consumers and not out of any taxes levied or to be levied; that the plaintiffs as alleged taxpayers have no equitable or legal right, title or interest in the water fund or any part thereof, and have no liability to replenish the water fund in the event of misappropriation; that the allegedly wrongful acts cannot be assailed in a court of equity since they cannot result in an increase in the taxes of the plaintiffs

153

and there is nothing in the complaint which shows that the plaintiffs will suffer any loss or damage by reason of any matters therein set forth; that the matters alleged in the complaint with reference to the possibility of involvement of the general corporate funds of the City of Chicago under the permit issued by the Secretary of the Army could not be considered since the permit refers only to the construction of the cofferdam, which is the only construction which could have interfered with navigation and that this and all other matters alleged in the complaint have been adjudicated against the plaintiffs and taxpayers generally in Bowes v. City of Chicago, supra; that the plaintiffs have failed to show in their complaint that they as taxpayers have suffered any injury by reason of the performance of the contract awarded to the Grafe group.

The court on October 31, 1955 sustained the motions of the defendants and ordered the amended complaint stricken. The plaintiffs thereupon elected to abide by their amended complaint and on November 4, 1955 the court entered the final decree appealed from.

█ In order that plaintiffs, as taxpayers, may maintain an action to restrain a municipality from awarding or proceeding with the contract, two elements must be present: first, that the plaintiffs are actual taxpayers within the corporate boundaries of the municipality; and second, that the action of the municipality which they seek to restrain or abrogate is such that if the allegations in their complaint are true a loss to the general taxpayer would ensue. In the case before us it is admitted that all payments for the construction of the tunnels will be made from the water fund of the City of Chicago or from funds obtained from the sale of water certificates of indebtedness, and will not come from the tax funds or the general public funds. In the complaint it is alleged that the City of Chicago, unless restrained by injunction, will disburse moneys "out of the Water Fund of the

154

City of Chicago, or out of the proceeds of the sale of Water Works Certificates of Indebtedness, the principal of which, together with interest thereon, must be paid out of said Water Fund," and the relief prayed in particular that the city be restrained from expending any sums of money, by reason of the contract, from the water fund or from the proceeds of sale of certificates of indebtedness, payable out of said water fund.

The plaintiffs in their brief argue that under the permit issued by the Secretary of the Army the city has obligated itself to pay "specified costs, elements of damage and reimbursement to the United States, which expenditures could not legally be paid out of the Water Fund, but under the law had to be paid out of the general fund of the City of Chicago," and that therefore the plaintiffs as taxpayers have a right to maintain the instant suit.

■■ The complaint does not seek to restrain the city from constructing the filtration plant or from contracting generally for the construction of tunnels as a part of the said plant. The only contention made by the plaintiffs is that the city improperly awarded the contract for the construction of the tunnels to the Grafe group, and that thereby the amount of money to be paid by the city from the water fund or from water certificates of indebtedness was greater than it would have been if the contract had been given to the Healy group. There is no showing, nor has it been urged before us either in the briefs or upon oral argument, that the contract as awarded would result in any expenditure of money from the general corporate fund. The right of a plaintiff to sue as a taxpayer rests upon a misappropriation of the general public funds and is founded upon the proposition of his equitable ownership of such funds and his liability as a taxpayer to replenish the treasury in case of misappropriation. His complaint must establish this situation, otherwise it is fatally defective. Golden v. City of Flora, 408 Ill.

129; Jones v. O'Connell, 266 Ill. 443; Fergus v. Russel, 270 Ill. 304. In the instant case, no matter to whom or upon what terms the city awarded the contract for the construction of the tunnels in question, payment for the same would be made from the water funds or out of the proceeds of sale of water works certificates of indebtedness and could not result in the use of the taxpayers' money. In Golden v. City of Flora, 408 Ill. 129, taxpayers filed a suit to enjoin the City of Flora from carrying out the provisions of an allegedly void ordinance, which permitted the city to enter into a collective bargaining agreement with a labor union representing the employees of the municipally owned and operated light, water and sewage disposal systems. The Supreme Court held that since the wages involved did not come out of tax funds, but from the revenue of the utility involved, the plaintiffs as taxpayers had no right to maintain their suit, and the court said:

"This right of the taxpayer to sue is founded on the proposition of his equitable ownership of such funds and of his liability to replenish the treasury in case of misappropriation. His complaint must establish this situation, otherwise it is fatally defective. Jones v. O'Connell, 266 Ill. 443; Fergus v. Russel, 270 Ill. 304."

In Price v. City of Mattoon, 364 Ill. 512, cited with approval in Bowes v. City of Chicago, 3 Ill.2d 175, taxpayers brought an action questioning the legality of a bond issue of the City of Mattoon for the purpose of buying the water system of a local utility company and to start construction of a softening and filtration plant. The bond issue was to be financed solely out of revenue derived from the sale of water to consumers and not out of any tax or taxes levied. The Supreme Court held that plaintiffs had failed by their complaint to show their right to sue as taxpayers since the purchase under the circumstances created no liability against the general funds of the city and no special liability on the city. It would not result in the use of

taxpayers' money and hence plaintiffs had no right to maintain the action. See also Dudick v. Baumann, 349 Ill. 46; 64 C. J. S. Municipal Corporations, sec. 2143; Dillon, Municipal Corporations (5th Ed.) sec. 1579.

■ In their briefs the plaintiffs base their right to sue as taxpayers squarely upon Bowes v. City of Chicago, supra, contending that the Supreme Court in its decision held that the plaintiffs therein, suing as taxpayers, had the right to bring an action to enjoin the city from constructing the Central District filtration plant because of the irrevocable liability imposed upon the city under the Federal permit, which would require the city to make payments out of the corporate funds in the fulfillment of such obligations. After determining that the plaintiffs in that case had the right to bring the suit, the court then considered the matter on its merits and dissolved the injunction against the city on the ground that the construction of the filtration plant would constitute no material substantial interference with navigation. The allegations in the plaintiffs' amended complaint upon which they rely as giving them the right to sue as taxpayers are substantially the same as those set out in the complaint in the Bowes case. It is the law that a judgment for or against a governmental body in a suit instituted by a taxpayer as a representative of his class is binding and conclusive on all residents, citizens and taxpayers with respect to matters adjudicated which are of general and public interest (50 C. J. S. Judgments, sec. 796(b); People ex rel. Castle v. Wright, 8 Ill.2d 454), and this is true whether or not the taxpayers in a second suit are the same plaintiffs as those in the case first decided. In Harmon v. Auditor of Public Accounts, 123 Ill. 122, it was held that a decree in an earlier taxpayers' suit was res judicata not only of all issues which were actually tendered in that case but of all issues which could have been raised. The court in the Bowes case held that the plaintiffs in that case

157

had a right to sue as taxpayers because of the obligation which by virtue of the Federal permit irrevocably attached to the corporate funds of the City of Chicago. Their right was predicated squarely on the fact that the suit was brought to prevent the construction of the filtration plant in toto. If such construction had been enjoined by the court, it would relieve the city from any involvement of the corporate funds. The court in that case on the merits held that the allegations with reference to interference with navigation, which were necessary to support a possible depletion of the corporate funds, lacked substance, and the writ of injunction was dissolved. After that decision no second action could have been brought by a taxpayer to restrain the City of Chicago from proceeding with the construction of the filtration plant. If such an action could not be brought, then certainly the plaintiffs in this case cannot be helped by the fact that in the Bowes case it was originally held that taxpayers had the right to maintain the action therein brought. Nor would the basis on which the Supreme Court held that the taxpayers had the right to sue in the Bowes case aid the plaintiffs in this action, even though they brought their suit before there was a decision on the merits in the Bowes case. The fact that under the Federal permit the city had assumed certain obligations which involved the corporate funds could have no possible application to the case before us. The right to maintain this suit must be derived solely from the allegations in the complaint, and we have shown that they were not sufficient to maintain this action. The plaintiffs cannot rely on allegations raising issues which would have been of no value to them in the first instance and which the Bowes case decided adversely to their contentions.

 In their brief the plaintiffs say that the defendants by their motion "challenged the right of the plaintiffs, as taxpayers, to maintain this suit, on the

ground that the construction of the water filtration plant is to be financed entirely out of the Water Fund and proceeds of Water Works Certificates of Indebtedness, and not from the general funds of the city. This contention was not passed upon by the trial court in sustaining the defendants' motions, but since it is raised in defendants' motions we will discuss it." The issue was raised in the trial court by the defendants' motions to strike. The record shows the statement made by the trial court at the time he rendered his decision. It is true that in that statement he made no reference to this point. However, the trial court dismissed the plaintiffs' cause for want of equity. In Scharlau v. Lombard State Bank, 278 Ill. App. 487, the court says, quoting from the case of Chicago Title & Trust Co. v. Schwartz, 339 Ill. 184:

" 'Where the chancellor reaches a correct conclusion in dismissing a bill for want of equity it can make no difference what led him to such conclusion. (Morse v. Seibold, 147 Ill. 318.) It is the decree, and not the statement of the chancellor, which is before us for review. Error cannot be assigned on the statement and its import is of no determining force here. Appellees have the right to sustain this decree upon any facts in the record, whether the reasons given in the chancellor's statement are good or not. (Pelouze v. Slaughter, 241 Ill. 215; Froehlich v. Minwegen, 304 Ill. 462.)' "

It is immaterial whether the court in his oral statement at the time that he sustained the motions to strike did or did not refer to this issue. It is a well settled rule of law that a decree of the trial court may be sustained on any basis appearing in the record. Becker v. Billings, 304 Ill. 190; In re Estate of Leichtenberg, 7 Ill.2d 545; Hazel v. Hoopeston-Danville Motor Bus Co., 310 Ill. 38; Mulvihill v. Shaffer, 297 Ill. 549. The decree of the trial court must be sustained.

Because of the view which we take, it is not necessary to discuss or advert to any of the other numerous points raised by the plaintiffs. The decree of the Circuit Court of Cook county is affirmed.

Decree affirmed.

ROBSON and SCHWARTZ, JJ., concur.