Wacker-Wabash Corporation et al., Plaintiff-Appellant, v. City of Chicago, Defendant-Appellee.

Gen. No. 45,859.

Opinion filed May 28, 1953. Rehearing denied June 24, 1953. Released for publication June 24, 1953.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, and SLADKEY, LANHAM, OLDS & SWANSTROM, all of Chicago, for appellant; EDWARD P. MORSE, JEROME J. SLADKEY, GEORGE P. NOVAK, and EDWIN A. ROTHSCHILD, all of Chicago, of counsel.

JOHN J. MORTIMER, Corporation Counsel for City of Chicago, for appellee; JOHN C. MELANIPHY, JOHN P. McGOORTY, FRANCIS S. LORENZ, all of Chicago, of counsel.

MR. PRESIDING JUSTICE LEWE delivered the opinion of the court.

Plaintiff appeals from a judgment in favor of defendant entered upon the verdict of a jury in an action at law to recover damages resulting from the alleged wrongful abandonment by the City of a proceeding to condemn certain lots for the purpose of opening a street under the provisions of the Local Improvement Act. Plaintiff's motions for judgment notwithstanding the verdict and, in the alternative, for a new trial were overruled. This cause was appealed directly to the Supreme Court, where it was ordered transferred to this court.

October 19, 1935 a complaint was filed consisting of five counts, and on August 4, 1950 plaintiff filed an amended complaint consisting of two counts, one in chancery and the other in law. Afterwards, upon defendant's motion to strike both counts, an order was entered sustaining defendant's motion to strike the chancery count and overruling its motion as to the law count. Defendant answered and plaintiff filed a reply to portions of defendant's answer. No question is raised on the pleadings.

Pursuant to the recommendations of the Chicago Plan Commission, the City Council passed certain ordinances for the improvement of Wacker Drive to relieve traffic congestion in the area of the City of Chicago known as the "Loop." Since the plan as a whole proposed by the Chicago Plan Commission was never adopted in one ordinance, the City Council enacted six different ordinances between the years 1919 and 1922 recommended by the Board of Local Improvements, relating to various parts of the plan. These ordinances provided for the construction of a double-deck roadway which followed in a westerly direction the south bank of the Chicago River from the Michigan Avenue bridge to west Lake Street, with convenient ramps to the lower level of Wacker Drive. The first two ordinances provided for the taking of land lying between the south

bank of the Chicago River and the east and west street then known as South Water Street. The other ordinances related to the opening of four feeder streets for the purpose of providing ingress to and egress from the lower level of Wacker Drive. Among these proposed streets was Holden Court, to be located midway between Wabash Avenue and State Street and extending north from Lake Street to the lower level of Wacker Drive. The ordinance for the condemnation of the property necessary for the opening of Holden Court was passed by the City Council on July 21, 1922, and on October 22, 1923, condemnation proceedings were instituted.

Some time between July 24 and October 25, 1924, plaintiff's predecessor in title, Riverside Plaza Corporation, acquired title to lots 8 to 15 inclusive in Block 18, Fort Dearborn Addition to Chicago. These lots are located at the southwest corner of Wacker Drive and Wabash Avenue. Lot 15 is the most easterly lot, facing Wacker Drive at the intersection of Wabash Avenue, and lot 8 is the most westerly. All of the lots are 160 feet 8 inches long. Lot 8, which is 22½ feet wide, was one of four lots to be taken for the opening of Holden Court.

October 20, 1926 the entire Wacker Drive improvement was substantially completed except for the opening of the proposed Holden Court and Haddock Place.

October 27, 1933 the condemnation proceedings instituted by the City for the purpose of securing the necessary property to open Holden Court were dismissed and the project abandoned.

The uncontroverted evidence shows that the building was erected on lots 9 to 15 inclusive. The lower part of the building is 23 stories high and superimposed upon it is a tower consisting of 17 stories which occupies about one-fourth of the ground area. The structure was designed as an open and isolated building bounded on

the east by Wabash Avenue, on the north by Wacker Drive, on the south by Haddock Place and on the west by the proposed Holden Court. All four sides of the building were faced with ornamental terra cotta from top to bottom and on the west side fronting the proposed street to be known as Holden Court there are approximately 300 windows. In the south-central part of the building from the basement to the twenty-third floor there was a garage serviced by four elevators. The entrance to the garage was designed to be on the proposed Holden Court where there were four doors leading to the elevators, and the two exit doors of the garage were on the east side of the building facing Wabash Avenue. The garage was designed to hold 550 automobiles and to be operated by electrical controls. Shortly after the garage had been in use mechanical difficulties developed and it then was manually operated. Subsequently nearly all of the garage area was converted to office use and leased to tenants. A party-wall agreement affecting the west side of lot 8 reduced the usable area of that lot to a width of 20 feet. Because of the lack of space in lot 8 it became impractical to use the entrance to the garage on the west side as originally planned, and the entrance and exit were therefore reversed.

Plaintiff contends that the undisputed facts show a contractual right in the plaintiff to have the proposed Holden Court opening completed.

Plaintiff's principal witness was one Lorenzo C. Dilks, former president of Starrett-Dilks Company, general contractors who erected the building on the premises here involved. Testifying by deposition, Dilks' testimony is substantially as follows. Some time in 1923 or 1924 Dilks told Sloan, president of the Board of Local Improvements of the City of Chicago, of the proposed plans for constructing an office and garage building on lots 8 to 15 inclusive. At this meeting Dilks

349

either showed Sloan the plans or told him about them, whereupon Sloan stated that the plans would have to be revised because lot 8 was to be taken for the proposed street to be known as Holden Court. This was the first time Dilks learned of the opening of the proposed Holden Court. After conferring with the architects and others the plans were revised to omit lot 8 and to provide for the construction of the proposed building on lots 9 to 15 inclusive. Brochures and pamphlets were prepared and printed showing the proposed building bounded by four streets including the proposed Holden Court. Some time in May or June 1925 all of the old buildings on lots 8 to 15 were razed. In June 1925 Starrett-Dilks Company, the general contractors, applied for a permit to construct the building. Shortly thereafter Dilks had a conference with Doherty, the City Building Commissioner, who stated that he would turn over the plans to the Fire Commissioner and to the Board of Local Improvements. Doherty also stated that there were questions about a combination garage and office building which would have to be submitted to the Corporation Counsel. During this period Dilks, accompanied by one Ennis, had several conferences with the Fire Commissioner of the City relative to fire protection. Dilks and Ennis also conferred with the City's Corporation Counsel who advised them that he had been asked to issue a written opinion as to whether the structure which contained a garage completely surrounded by offices should be permitted, and that the Corporation Counsel said he had issued an opinion that the structure was permissible. June 15, 1925 the City Council passed an ordinance which recited in substance that since the Wacker Drive improvement then in progress of construction might conflict in some degree with the construction of the proposed building, the Commissioner of Buildings and the Fire Commissioner were directed to withhold the issuance of building per-

mits until they received written advice from the Board of Local Improvements that such conflict no longer existed. About July 1925 Dilks, accompanied by Ennis and another person, had a conference with the then Mayor of Chicago, Wm. E. Dever. At this conference the Mayor inquired about the building plan and the arrangements to finance the cost of construction. According to Dilks the Mayor stated that he "would help as much as possible" and speak to the Corporation Counsel and the heads of some of the other city departments involved. During conferences between Dilks and the Fire Commissioner, Dilks was told that Siamese connections would have to be installed on the west side of the building, for the reason that it would face a public street. In accordance with the Fire Commissioner's request three Siamese connections were placed on the west side of the building and approved by him. About July 1925 Dinkelberg, one of the architects, accompanied by Ennis and Dilks, met with Sloan who requested a letter stating that the proposed building would conform to the city ordinances and the proposed improvement. Sloan also asked to examine the plans of the proposed building to make certain that lot 8 was omitted because it was to be taken for the proposed street to be known as Holden Court. At this conference Sloan also stated that the city officials were negotiating with the owners of the lots necessary to open Holden Court and if they could not agree on the fair value it would be submitted to a jury. Afterwards a letter dated July 23, 1925, signed by the Riverside Plaza Corporation, the architects, and Starrett-Dilks, addressed to Frank E. Doherty, Commissioner of Buildings, at Sloan's request, was delivered to him by Dilks, which reads:

"In order to justify you in issuing permit for the construction of the Jewelers Building, and in order to save time badly needed for the construction work, we hereby

351

agree at the earliest possible moment to submit further detailed drawings showing the construction and location of the fire shield stairways and connections in form to comply with the ordinances and for your approval. In other words, it is not our intention to proceed with any construction in detail or items until after your formal approval has been secured for these things."

Shortly thereafter the building plans were approved, permits were issued and the construction of the building was begun.

The evidence further shows that the Wacker Drive improvement ordinance provided for an ornamental Bedford stone railing and a pylon cluster light at the upper level of Wacker Drive at the proposed Holden Court. This was not done. If it had been, the railing and light would have overhung lot 8 about three feet. Instead a wooden railing was built along the upper level and across the proposed street. More than fifty iron reinforcing rods were installed by the City in 1925. These iron rods extended about 2½ or 3 feet south beyond the South Water Street lot line into lot 8 until January 1951 when they were removed by the City.

Besides Dilks, other witnesses testified in behalf of the plaintiff. John R. Fugard, an architect, engineer and manager of the building here in question since 1934, testified in substance that while the building was being erected he had a "close contact" with the general contractor; that he had possession of the original plans of the building erected on lots 9 to 15 inclusive; that he never saw any drawings of a plan for a structure covering the entire premises including lot 8; and that the garage became an economic liability because of defendant's failure to open the proposed Holden Court. Plaintiff's witnesses John R. Bailey and Glen C. Crawford, both real estate experts, testified to the fair cash mar-

ket value of lots 8 to 15 and the improvements thereon before and after the abandonment of the proposed Holden Court improvement. Another witness, Stanley O. Chadwick, a real estate expert, testified particularly about the operation of the garage and the necessity to its successful operation of the opening of Holden Court. Other witnesses for plaintiff testified with respect to the rentals received from the building and the garage and the cost of their operation, the reorganization and financial difficulties of plaintiff's predecessor, and the transfer of the title to the premises here in controversy.

The record, consisting of more than seventeen hundred pages, also contains voluminous exhibits. It would unduly extend this opinion to relate plaintiff's evidence in greater detail.

The gist of the complaint is that the City required the plaintiff to conform its building to the proposed Wacker Drive improvement and refused to issue a building permit unless it did so; that the City agreed to complete the opening and improvement of the proposed Holden Court in consideration of the plaintiff's agreeing not to build any part of the building on lot 8 and that before issuing a permit the City requested as a prerequisite an agreement in writing executed by the plaintiff which was delivered to the City and accepted by it. The agreement in writing referred to in the complaint consists of a letter dated July 24, 1925, addressed to the Honorable John J. Sloan, President, Board of Local Improvements, Chicago, Illinois, and reads as follows:

"Dear Sir: We, the undersigned, hereby agree in constructing the Jewelers Building on the corner of Wacker Drive and Wabash Avenue, that we will work in harmony with and properly cooperate with the Board of Local Improvements of the City of Chicago in such

manner as to cause no interference with the construction of South Water Street improvement. We agree to make the details of design and construction of the Wabash Avenue garage entrance to meet the requirements of South Water Street improvement and the approval of the Bureau of Design of the Board of Local Improvements. [Signed] Riverside Plaza Corporation, F. P. Dinkelberg, Starrett-Dilks Company."

 Where there is a statute or ordinance prescribing the method by which an officer or agent of a municipal corporation may bind the municipality by contract, that method must be followed, and there can be no implied contract or implied liability of such municipality. Where the agents of a city are restricted by law as to the methods of contracting the city cannot be bound otherwise than by compliance with the conditions prescribed for the exercise of power. (*Roemheld v. City of Chicago*, 231 Ill. 467.)

 In *Selby v. Village of Winfield*, 255 Ill. App. 67, the court said at page 73:

"Where a collection of individuals, designated in a manner provided by law, are created a body to whose care public affairs are committed, the body so created is powerless to act, except together as a body, and where a record of its proceedings is required to be kept, such record is the only lawful evidence of its action, and it cannot be changed by parol proof."

And continuing at page 77 the court held:

"Everyone is presumed to know the extent of the powers of a municipal corporation, and it cannot be estopped to aver its incapacity, which would amount to conferring power to do unauthorized acts, simply because it has done them and received the consideration stipulated for."

To the same effect see *Schwartz v. City of Chicago*, 221 Ill. App. 328.

In the *Village of Bellwood v. Galt,* 321 Ill. 504, the court said at page 508:

"The board of local improvements is a body to which are committed not only the initiation of all public improvements to be made by special assessment or special taxation, but also important duties in regard to the making of contracts for the construction of such improvements and the performance of such contracts. Official action of such a body can be taken only by a majority of its members meeting together and acting officially. (*People v. Chicago and Eastern Illinois Railway Co.* 306 Ill. 402; *McKeown v. Moore,* 303 id. 448; *McManus v. McDonough,* 107 id. 95.) When a record of its proceedings is required to be kept the record is the only lawful evidence of its action, and it cannot be contradicted or added to by parol. *People v. Madison County,* 125 Ill. 334; *People v. Smith,* 149 id. 549; *People v. Carr,* 231 id. 502; *People v. Warren,* id. 518; *Southworth v. Board of Education,* 238 id. 190; *City of Belleville v. Miller,* 257 id. 244; *People v. Toledo, St. Louis and Western Railroad Co.* 270 id. 472; *People v. Hartquist,* 311 id. 127."

A stricter rule prevails with reference to acts and declarations of public agents than ordinarily governs mere private agents. (*State v. Illinois Cent. R. Co.,* 246 Ill. 188.)

In support of its contention that there is a contractual liability plaintiff cites *Gregsten v. City of Chicago,* 145 Ill. 451, and *Great Lakes Dredge & Dock Co. v. City of Chicago,* 353 Ill. 614. These cases are readily distinguishable from the instant case. In the *Gregsten* case it appears that the City was not, as here, acting in a governmental capacity. Gregsten was granted a permit to build a vault under a public alley adjacent to his premises. The vault had been in use for twenty years without objection by the City when it granted a permit to another property owner to use one-half of the space

355

occupied by Gregsten. He had executed a bond to keep the City harmless from all loss or damage resulting from the vault being out of repair. There the court held that the bond and the permit given Gregsten constituted a contract between him and the City. In *Great Lakes Dredge & Dock Co. v. City of Chicago,* involving the construction of a contract, the court held that the provisions of an ordinance had given the Commissioner of Public Works plenary power to make all contracts necessary and to determine all questions of dispute arising thereunder.

In the case at bar the complaint is framed on the theory that plaintiff was required to conform the building to the entire Wacker Drive improvement and in support of this theory argues that the agents of the City required plaintiff to give letters agreeing to conform its building to the Wacker Drive improvement as a whole including lot 8. This contention is without merit. The record shows that the plaintiff here appealed to the Supreme Court from an order of the county court approving a Certificate of Final Completion of the Wacker Drive improvement (*City of Chicago v. Wacker-Wabash Corporation,* 372 Ill. 521); that in that proceeding, as here, plaintiff contended that the proposed Holden Court opening was an integral and necessary part of the South Water Street improvement (Wacker Drive), and that it could not be certified as substantially completed without the opening and improvement of proposed Holden Court. At page 527, the court said:

"In the case we are considering, except for the general plan of the city plan commission, there is no connection between the Holden Court and South Water street ordinances, each being a separate and distinct local improvement, neither being dependent on the other to

356

any greater extent than each of two intersecting streets is always dependent on the other."

■ In the present case there is no evidence tending to show any official action by the Board of Local Improvements or the City Council with respect to changes in the design, structure or location of a proposed building on lots 8 to 15 inclusive. Plaintiff's case hinges on the testimony of Dilks. It should be noted that the letters written by plaintiff's predecessor in title dated July 23 and 24, 1925, plaintiff's Exhibits 34 and 35, the latter of which is characterized in the complaint as an "agreement," make no reference to lot 8 or the building to be erected thereon, nor do they make any reference to the proposed Holden Court. Under the authority of *Village of Bellwood v. Galt,* 321 Ill. 504, we hold that the statements and representations alleged to have been made to Dilks by Sloan, Doherty and other officers of the City do not establish any contractual rights between plaintiff and defendant.

Plaintiff maintains that defendant was estopped from abandoning the proposed Holden Court improvement. In support of its contention that the doctrine of estoppel is applicable, plaintiff cites *Martel v. City of East St. Louis,* 94 Ill. 67; *People v. Wieboldt,* 233 Ill. 572; *City of Sullivan v. Tichenor,* 179 Ill. 97; *People v. City of Rock Island,* 215 Ill. 488; and *Melin v. Community Consolidated School District No. 76,* 312 Ill. 376. An examination of these cases discloses that the facts in each of them are dissimilar to the present case and we think none sufficiently akin to this case to make it decisive of the issues here. Plaintiff relies strongly on the case of *Times-Mirror Co. v. Superior Court,* 3 Cal. (2d) 309, 44 P. (2d) 547. This was a mandamus proceeding for an order directing the Superior Court of Los Angeles to set certain condemnation proceedings for trial and to proceed to a final determination. In that

357

case it appears that the State of California, the County of Los Angeles, and the City of Los Angeles had taken action to designate an area as a civic center in which all of the buildings of a public character such as the federal, state, and municipal, were to be located. The Times-Mirror Company, which published the Los Angeles Times, a secular newspaper, was located in this area. The State, in compliance with its agreement to cooperate with and assist in carrying forward the civic center program, constructed a large building within the civic center to house the State Supreme Court, District Court of Appeal, Governor of the State, State Commissions, and other State employees. A new City Hall was erected and located in the civic center facing the State building. The State building stands crowded against the Times-Mirror building which was so placed with the understanding between the Governor and the State Representatives that the City and County would, in accordance with their agreement, acquire title to the Times-Mirror property and transfer it to the State. The Times-Mirror building abuts within two feet of and obstructs the view of the State building and blocks completion of the main entrance. Letters were written by the Governor addressed to the Board of Supervisors of the County and the City Council to acquire the necessary land and remove the structures thereon and the City Council gave assurance that the title to the Times-Mirror building and other property would be acquired by purchase or condemnation and then vested in the State in accordance with the agreements of the City and County. Identical resolutions were passed by the Board of Supervisors and the City Council for the creation of a civic center and defining the area. Relying upon the ordinances, resolutions, reports, statements, and other documents, the Times-Mirror Company believed this property would be taken, and built a new modern newspaper plant costing $4,500,000 at

another location. This new building, like the other which it still occupied, was suitable for no other purpose. The court held, at page 557, that the unusual circumstances of the case require the application of the doctrine of estoppel *in pais* as announced in the case of *City of Los Angeles v. Cohn*, 101 Cal. 373, 35 Pac. 1002, 1003.

█ The facts in the *Cohn* case are entirely dissimilar from the facts in *Times-Mirror Co. v. Superior Court* or those of the instant case. In the *Cohn* case a predecessor of the defendant laid the foundation for a building which encroached upon a public street. When it was called to the attention of the City Council the matter was referred to the City Attorney for investigation. The City Attorney made a lengthy report to that body, holding that Temple, plaintiff's predecessor in interest, was the owner of the land. The report was ordered received and placed on file and a synopsis was entered upon the minutes of the board. The building was then erected to completion and nothing further was done by the City until the suit was brought twenty years later. The unusual circumstances in the *Times-Mirror* case upon which the court rested its decision are not present in this case. In that proceeding there was joint action by the State, County and City to condemn a large area of land for use as a civic center. In the case before us, as stated in *City of Chicago v. Wacker-Wabash Corporation*, 372 Ill. 521, the condemnation proceeding relates only to a distinct local improvement, namely, the opening of the proposed Holden Court. We are of the opinion that the doctrine of estoppel which plaintiff seeks to invoke is not applicable to the facts in the instant case.

Plaintiff contends that the abandonment of the proposed Holden Court improvement was wrongful and unlawful and gave rise to a cause of action under Article II, Section 13 of the Constitution for damages sus-

tained by plaintiff. In its brief defendant concedes that in a proper case a municipality is liable for damages occasioned by the wrongful delay or abandonment of a condemnation proceeding.

 Plaintiff says that the failure to abandon the proceeding within a reasonable time and after a lapse of more than ten years made such abandonment wrongful. In the recent case of *Roach v. Village of Winnetka,* 366 Ill. 578, at page 582, the court said: "In the majority of jurisdictions in which the question has arisen, it has been held that where condemnation proceedings have been unreasonably prolonged by the condemnor and are finally abandoned, the property owner may recover damages resulting from the delay, although the condemnor had the absolute right to abandon the proceedings." In our view the question whether the delay or abandonment of the proposed Holden Court was wrongful presented an issue of fact for the jury to determine.

The record shows that when the City filed its application for confirmation of the special assessment relating to the proposed Holden Court in the county court of Cook county, plaintiff here in that proceeding filed 118 objections; that these objections and those filed by all the other parties were overruled; that on April 16, 1930 an order was entered reducing the assessment; and that the proceedings were active until October 27, 1933 when the City's petition was dismissed.

 It is undisputed that no final judgment was entered in the condemnation proceedings. Under the provisions of the Local Improvement Act, Chapter 24, Section 84—32, Ill. Rev. Stats. 1951, State Bar Edition [Jones Ill. Stats. Ann. 21.2239], the City could dismiss the cause "within ninety days after final judgment as to all defendants, both as to the amount of damages and compensation to be awarded and benefits to be

assessed . . . ." It was not necessary to give the plaintiff here notice that an order of dismissal would be entered (*Pearson v. City of Chicago*, 162 Ill. 383).

As to the damages alleged to have been sustained by plaintiff, there is a sharp conflict between the testimony of plaintiff's and defendant's real estate experts as to the value of the premises here in controversy on the day before and the day after the condemnation proceedings were dismissed.

 After a careful examination of the record we think the evidence is ample to support the verdict of the jury and we cannot say, therefore, that the verdict is against the manifest weight of the evidence.

As further grounds for reversal plaintiff urges that the court erred in admitting improper evidence offered on behalf of the defendant and in refusing and giving certain instructions.

 Plaintiff argues that the court permitted prejudicial error by admitting evidence of the current market value of plaintiff's securities. Over plaintiff's objection the trial court permitted defendant's witness Garn, a stock and bond broker, to testify that since 1948 he dealt in stocks and bonds issued by the plaintiff; that he was familiar with the stock and bond quotations and made a chart showing their value since January 1, 1948. This chart shows that the market value of the bonds increased from $61 in 1948 to $114.50 in 1951. There was also admitted into evidence a letter dated January 1, 1951 signed by the voting trustees of the stock of the plaintiff corporation, addressed to the voting trust certificate holders, excerpts from which read: "The rise in market value of the bonds is indicated by the fact that in 1937 they were bought for the sinking fund at 10 per cent of par, whereas they are presently quoted at 98 per cent of par." "Interest paid on the bonds during the fiscal year ended April 30, 1938 was at the rate of $\frac{1}{2}$ of 1 per

cent; during the fiscal year ended April 30, 1950, 4¾ per cent interest was paid." The foregoing letter dated January 1, 1951, sent by plaintiff to its bondholders and stockholders, is competent as an admission against interest, for the reason that it tends to prove the enhanced value of plaintiff's property after dismissal of the proceeding contrary to the testimony of plaintiff's witness Crawford which is referred to hereinafter.

■■■ The chart, Defendant's Exhibit 28, merely brought the market quotations of the stocks and bonds up to the date of the trial. Since both the chart and the letter were admitted as competent evidence it was proper to take them into the jury room. See chapter 110, sec. 191(4) Ill. Rev. Stats. 1949, Ill. State Bar Assn. Ed. [Jones Ill. Stats. Ann. 104.067, subd. (4)].

Plaintiff's Exhibit 73 shows the annual gross rentals of the building and garage and the operating expenses of each from 1928 to 1950 and also the percentage of building occupancy during that period. Plaintiff's Exhibit 75 shows other income, expenses and adjustments not included in operating expenses. Plaintiff's Exhibit 76 shows the rentals of the converted space of the garage in plaintiff's building.

■■■ Defendant says the value of plaintiff's property was reflected by the value of the stocks and bonds and therefore it had a right to show the effect of the figures contained in the foregoing plaintiff's Exhibits on the market value of the stocks and bonds which represented plaintiff's property and the analysis of those figures by the voting trustees as contained in their letter of January 1, 1951. We think there is merit in defendant's contention for the reason that this evidence tends to show that plaintiff did not suffer the damage complained of. Moreover, since plaintiff introduced Exhibits 73, 74, 75 and 76 in evidence it is in no position to complain.

On cross-examination by defendant's counsel, one of plaintiff's witnesses, Glen C. Crawford, a real estate expert, testified that in his opinion plaintiff's property had a value in 1933 equal to the value of January 1, 1951. So far as the record shows, plaintiff did not object to this testimony. Defendant's witness Farr, also a real estate expert, testified that in his opinion there was no change in the value of plaintiff's premises between October 26, 1933 and October 28, 1933 by reason of the dismissal of the condemnation proceedings, and that the fair cash market value of lots 8 to 15 inclusive, with improvements thereon, on January 1, 1951, for its highest and best use, was $6,500,000.

██ Plaintiff made no objection to the testimony of its witness Crawford on cross-examination relative to the value of the property on January 1, 1951, therefore it was proper for the defendant to refute it and argue the point to the jury.

The record shows that defendant's witness Arthur Sullivan, attorney for the Board of Local Improvements, testified over plaintiff's objection that he had given an oral opinion to the board that there would be no liability on the part of the City were it to dismiss the condemnation proceedings.

██ Defendant argues that in accordance with the ruling in *Roach v. Village of Winnetka*, 366 Ill. 578, it became necessary for the defendant to prove, among other things, that the Board of Local Improvements referred the matter of abandoning the proposed Holden Court improvement to its attorney for an opinion and that an opinion was rendered. This testimony was incompetent. We think, however, that the harm, if any, resulting from the opinion of the witness was cured by an instruction, given to the jury at plaintiff's request, which told them in effect to disregard it.

██ Plaintiff also complains of the trial court's refusal to give plaintiff's instruction number 9 which

reads, "The court instructs the jury that evidence by way of deposition is entitled to the same force and effect, and is entitled to the same weight, as though the person was present and testifying in person." The use of the phrase, "the same weight," in an instruction was condemned in *Central of Georgia Ry. Co. v. Holmes*, 223 Ala. 188, 134 So. 875, where the court in adverting to *St. Louis & O'Fallon Ry. Co. v. U. S.*, said, at page 876: "There is quite a distinction between an instruction to the jury that they give due consideration to the evidence, and that such evidence is entitled to certain weight." Assuming that the refused instruction were proper, it would not be regarded as prejudicially erroneous. See *Olcese v. Mobile Fruit Co.*, 211 Ill. 539; *Coburn v. Moline & Watertown Ry. Co.*, 243 Ill. 448.

 Criticism is also leveled at defendant's given instructions numbers 4, 5 and 6, on the ground that they are abstract, inapplicable and misleading. We think these instructions correctly state the law governing the case.

We have considered the other points urged and the authorities cited in support thereof but in the view we take of this case it is unnecessary to discuss them.

For the reasons given, the judgment is affirmed.

*Judgment affirmed.*

FEINBERG and KILEY, JJ., concur.