PREMIER ELECTRICAL CONSTRUCTION COMPANY, Plaintiff-Appellant, *v.* THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant-Appellee.

First District (2nd Division)   No. 77-1214

Opinion filed April 10, 1979.

Patrick Mazza & Associates, of Chicago, for appellant.

Michael J. Murray, of Chicago (Richard E. Girard and Edward C. Peterson, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

This is an appeal from an order of the circuit court of Cook County denying damages to Premier Electrical Construction Company in connection with a bid it submitted to perform electrical work at a school owned and operated by the Board of Education of the City of Chicago.

On appeal Premier Electrical Construction Company (hereinafter Premier) contends that a contract existed between itself and the Board of Education; that the Board of Education breached the contract; and that as a result of the breach, it is entitled to recover damages.

The record indicates the following sequence of events occurred. The Board of Education of the City of Chicago (hereinafter the Board) solicited bids for electrical work to be done at Onahan Elementary School in Chicago. In accordance with certain Board rules and regulations, each bidder was required to submit an "Affirmative Action Pre-Award Survey" (hereinafter survey). The survey consisted of six pages requesting information about the bidder's employment practices.

Stanley C. Wielgos, vice-president of Premier, testified that due to a prior experience in connection with another bid where Premier's bid was returned for failure to include a survey, company procedures were instituted whereby two employees would witness that all necessary documents were included in the bid envelope. Wielgos stated that on June 5, 1975, he personally put a bid proposal, bid bond, and a complete survey in the bid envelope which was deposited with the Board by one of the two employees witnessing his actions.

On June 6, 1975, in accordance with statutory procedure (Ill. Rev. Stat. 1975, ch. 122, par. 10—20.21), all bids submitted on the Onahan project were read aloud and recorded. Joseph Brenner, administrative assistant to the director of the bureau of architecture of the Board, testified that it was his job to determine the low bidder and whether the necessary documents were submitted with the bid. He stated that he received Premier's bid along with its survey but did not actually count the number of pages included in the survey. He explained that after the low bid is determined, it is sent to the technical review board which checks to see whether specifications have been met and the bid is within the budget. If the bid is approved by the technical review board, Brenner then forwards the survey to Louis J. Barnes, director of the equal employment opportunity program, for approval.

Premier received the following unsigned form letter dated June 11, 1975:

"Gentlemen:

Bids for the Electrical contract on the Onahan Elementary School were opened by the Board of Education on June 6, 1975.

Pending final approval by the Board of Education that your firm is

in compliance with all applicable board policies and programs, it is anticipated that this contract will be awarded to you via Board Report at the June 25, 1975 Board Meeting."

Barnes testified to receiving Premier's survey on June 9, 1975. He noticed that the first four pages of the document were missing. He received only pages five and six plus a statement regarding Premier's affirmative action policy. He sent a memo to the bureau of architecture indicating that Premier's program was not approved due to its failure to include a work force inventory which was page three of the survey.

Barnes explained that in such a situation, the office of origin, in this case the bureau of architecture, decides whether to have the affirmative action program of the next lowest bidder evaluated, or to discard all bids and conduct a rebid, or to grant a waiver of the affirmative action program requirements. The office of origin notifies the bidder of the disapproval. A disqualified bidder can seek review by writing to the general superintendent or the office of origin. According to Barnes, a bidder is usually told of this procedure verbally, and there is no guarantee that a review will be given.

On June 16, 1975, Premier was notified that its survey was not approved because a work force inventory was not included. Wielgos sent a letter dated June 17, 1975, to the deputy superintendent of the Board, Manford Byrd, Jr., stating that Premier had submitted the inventory with its bid, enclosed a copy of its survey, and requested that it be reviewed. After receiving this letter, Byrd testified that he asked Barnes for comments.

On July 9, 1975, Barnes sent Byrd a written response stating that he could not answer Premier's letter because when he received its survey the first four pages were missing, and he had no way of knowing if Premier's contention that it submitted a complete survey was true.

Barnes testified that in formal competitive bidding, he cannot solicit information to amend affirmative action documents. He stated that if he finds obvious mistakes, omissions, or typographical errors in the survey, he seeks verification from the bidder and corrections are allowed. He also stated that verification of figures is considered a minor irregularity and is allowed provided the program as originally submitted was in substantial compliance. When handling such situations, Barnes said that he must use his discretion and judgment; that there was nothing in the guidelines which would allow a bidder in a formal competitive bid to submit additional information, supplement or modify information on its initial survey; and that he had no practice of communicating with a bidder when pages were omitted from the survey.

Barnes also testified that when a survey is sent to him, a file is made up and information as to the makeup of the bidder's work force is summarized on the inside cover of the file. Premier's file included a

notation "in compliance" dated June 9, 1975, which Barnes said indicated the survey being considered at that time was acceptable.[1] Barnes stated that surveys submitted by Premier in February, April, and August of 1975 for different contracts had been approved, but that this had no effect on whether the survey in question was acceptable.

Wielgos testified that on July 1, 1975, he was told by a Board employee to send a letter to Frank Mattox who was in charge of the Onahan project. Wielgos wrote a letter dated July 2, 1975, to Mattox explaining the situation and enclosed a copy of the survey requesting it be reviewed and its disapproval reversed.

Receiving no response, Wielgos stated that he sent another letter dated August 21, 1975, to Mattox stating he had not heard a decision and enclosed a sworn statement by one of Premier's employees to the effect that he witnessed the inclusion of a complete survey in the bid envelope. Wielgos testified that in September 1975, the Board asked Premier to extend the time of its bid in accordance with the instructions to bidders. Premier agreed and this agreement was reflected in a letter dated September 12, 1975.

Barnes stated that he received a copy of a letter dated September 9, 1975, addressed to Byrd from Saul Samuels, the director of the bureau of architecture, requesting that Premier be allowed to submit its complete survey for review. Byrd's signature appeared at the bottom of the letter under the word "approved." Barnes stated that he did not take any action upon receipt of the letter because Byrd had not directed him to evaluate the documents submitted and he was not sure what Byrd was approving.

Byrd testified that he approved Samuels' letter but explained that there was a reorganization of the Board in the fall of 1975, after which time he no longer dealt with the matter.

In December 1975, the Board rejected all bids submitted on the Onahan project and readvertised for new bids. The advertisement for new bids stated that there had been a revision in the plans and specifications. In January 1976, Premier submitted its second bid which was the same as its first bid since Premier found no change in the specifications. The Board admitted that in fact no change in the specifications had been made. Premier was not the lowest bidder and was not awarded the contract on the second bid.

On February 26, 1976, Premier filed a complaint requesting an emergency stay order be entered until a hearing could be held on the

---

[1] Whether this notation specifically referred to the affirmative action survey submitted by Premier in connection with the Onahan Elementary School job was not clarified in the record nor on appeal. The record does contain a document indicating that on June 10, 1975, the bureau of architecture received notice from the equal employment opportunity office that Premier's affirmative action program concerning electrical work at Onahan Elementary School had not been approved. From this and subsequent actions of the Board and Premier, we proceed on the premise that Premier's affirmative action documents involved in the instant case had not been approved.

matter; that the Board be restrained from entering into any contract with anyone other than Premier; and that the court issue a writ of mandamus requiring the Board to award the contract to Premier.

On May 12, 1976, joint contractors involved in the second bidding, filed a petition for a temporary restraining order and sought the award of the same contract.[2] By court order these cases were consolidated. After a full hearing, the trial court ordered the contract be awarded to the joint contractors and not to Premier. No appeal was taken from that judgment. Thereafter, Premier was allowed to amend its complaint to the proof presented at the hearing. Premier sought judgment against the Board for damages sustained as a result of the alleged wrongful rejection of its bid.

By court order of April 15, 1977, the denial of Premier's request for damages became final. Premier filed a timely notice of appeal from the April 15, 1977, judgment, seeking its reversal or in the alternative a new trial.

I.

In order to recover damages for breach of contract, Premier must first establish the existence of a valid contract. In an attempt to do so, Premier contends that the Board's letter of June 11, 1975, was intended to be an acceptance of Premier's bid, subject only to the Board's approval of Premier's affirmative action program.

The letter in relevant part stated:

> "Pending *final approval* by the Board * * * that your firm is in compliance *with all applicable board policies* * * * it is *anticipated* that this contract *will be* awarded to you via a Board Report * * *." (Emphasis added.)

No final approval being given by the Board, there can be no acceptance. ██ ▌ The Board of Education has only such powers as are conferred upon it by the legislature. The powers of the Board with reference to awarding contracts are set forth in article 34 of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 34—1), which is applicable to cities of over 500,000 inhabitants. Section 34—21.3 (Ill. Rev. Stat. 1975, ch. 122, par. 34—21.3) provides: "The board shall let all contracts * * * for * * * work involving an expenditure in excess of $2500 by competitive bidding as provided in Section 10—20.21 of The School Code." The Board is duty bound to let all contracts for work involving an expenditure in excess of $2,500 to the lowest responsible bidder after due advertisement. (Ill. Rev. Stat. 1975, ch. 122, pars. 10—20, 10—20.21.) However, the statute requires

---

[2] Gerson Electric Construction Co., et al. v. Board of Education of the City of Chicago, et al., No. 76 CH 2628, in the circuit court of Cook County.

that "money shall be appropriated or expended, * * * *only* at the regular meetings of the board and by a vote of a majority of the full membership of the board." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 122, par. 34—19.) Compliance with such statutory provisions is mandatory and a prerequisite to the formation of a valid contract. *Muehle v. School District No. 38* (2nd Dist. 1951), 344 Ill. App. 365, 100 N.E.2d 805; *Bituminous Casualty Corp. v. Folkerts* (1st Dist. 1940), 305 Ill. App. 443, 27 N.E.2d 670; *Trustees of Schools v. Martin* (3d Dist. 1929), 255 Ill. App. 206.

In cases involving contracting with a municipality, it has been held that where there is a statute prescribing the method by which an officer or agent of a municipal corporation may bind the municipality by contract, that method must be followed, and there can be no implied contract or implied liability of such municipality. (*Roemheld v. City of Chicago* (1907), 231 Ill. 467, 470-71, 83 N.E. 291; *Wacker-Wabash Corp. v. City of Chicago* (1st Dist. 1953), 350 Ill. App. 343, 354, 112 N.E.2d 903.) We find that same rationale applicable in the present case.

It is Premier's contention, however, that the statutory requirement of the Board's official approval cannot prevent the formation of a contract implied-in-fact upon a consideration of the circumstances and the conduct of the parties, or implied-in-law where equitable principles estop a party from asserting the nonexistence of an agreement. Premier argues that the Board's final approval is not dispositive of the issue of acceptance, but rather when the offeror and offeree are in agreement as to their mutual rights and duties in the contemplated undertaking, acceptance exists despite the presence of a conditional element.

Premier attempts to establish a contract implied-in-fact by arguing that it submitted the low bid which was allegedly accepted per the June 11, 1975, letter contingent only upon the approval of its survey; that it submitted a complete survey, which survey had been approved in connection with other bids both prior and subsequent to the bid in question; and that the Board allowed its request to resubmit its complete survey for review after which time the Board's silence indicated its intention that the bid be accepted.

First, we note the June 11, 1975, letter was written under the letterhead of McKee-Berger-Mansueto, Inc., Construction Management Services. There is no authority or evidence to support a finding that such corporation was empowered to accept a bid on behalf of the Board. The letter was a preliminary step by which Premier was informed it had submitted the low bid, and that its bid had to be approved by the Board prior to its acceptance.

■ Next, in accordance with its rule-making authority (Ill. Rev. Stat.

1975, ch. 122, par. 34—19), the Board required bidders as a condition precedent to the "consideration and/or acceptance" of a bid to submit an acceptable affirmative action survey. This rule was written on the first page of the "Affirmative Action Pre-Award Survey" as well as included in the instructions given Premier in the bid specifications. According to Mr. Barnes, each time a bid is submitted, the accompanying affirmative action survey is evaluated without regard to any previous surveys accepted from the same bidder on other jobs. What Premier fails to mention is that subsequent to the June 11,. 1975, letter, on June 16, 1975, Premier was notified by the Board that its affirmative action survey had not been approved. Thereafter, Premier resubmitted a survey but never received any indication of its acceptance from the Board. Rather, Premier was notified in December 1975 that the Board decided to reject all bids and readvertise. The record indicates that in solicitation of the instant bid, the following notice was included:

"ACCEPTANCE OR REJECTION OF PROPOSALS
The Board * * * reserves the right to * * * reject any or all proposals or any portion of any proposal submitted, and reserves the right to disregard any informality in the bids and bidding, when the best interest of the Board will be served by such action."

In addition, Board Rule 5—9 stated: "The Board of Education or the General Superintendent of Schools shall have the right to reject any or all bids or proposals." Such facts do not support the existence of a contract implied-in-fact.

Premier also contends that because the Board's own failure to review its survey prevented the formal action by the Board, the Board is estopped from claiming that it did not accept Premier's bid. While the doctrine of estoppel may be applied against school boards (*Stahelin v. Board of Education* (2d Dist. 1967), 87 Ill. App. 2d 28, 39, 230 N.E.2d 465), it should be invoked only in extraordinary circumstances and may not be used to defeat the effective operation of a policy adopted to protect the public (*Ponton v. Illinois State Board of Education* (1st Dist. 1978), 62 Ill. App. 3d 907, 909, 379 N.E.2d 1277; *Anderson v. Board of Trustees* (4th Dist. 1978), 56 Ill. App. 3d 937, 939, 372 N.E.2d 718). Such extraordinary circumstances do not exist in the instant case.

Where no contract exists, Illinois law forecloses a private cause of action to an unsuccessful bidder for recovery of damages. (*Beaver Glass & Mirror Co. v. Board of Education* (2d Dist. 1978), 59 Ill. App. 3d 880, 884, 376 N.E.2d 377.) In reliance on section 10—20.21 of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 10—20.21) which requires a contract to be awarded to the lowest responsible bidder, the plaintiffs in *Beaver*

sought a writ of mandamus to compel the Board of Education to award them a certain contract upon which they were the lowest bidders. Although the court found the Board's award of the contract to the second lowest bidders was improper, it denied recovery of damages to the plaintiffs. It found that section 10—20.21 was never intended to create such a private remedy.

The rationale underlying the court's decision was that the authority for letting public contracts is for the public benefit and is not intended as a direct benefit to the contractor. Therefore, the action of public officials in failing to award the contract to the lowest bidder should not penalize the public by first requiring the unjustified additional expenditure of public funds on the awarded contract and then by allowing damages to the aggrieved low bidder.

Finally, Premier argues that it is at least entitled to recover bid preparation costs regardless of whether a contract existed, citing *Keco Industries, Inc. v. United States* (Ct. Cl. 1974), 492 F.2d 1200, as authority. *Keco* is a Federal case governed by Federal statutes and regulations. But even if we were to follow the rationale of *Keco*, Premier would not be entitled to its bid preparation costs. The court in *Keco* set out the following guidelines under which an unsuccessful bidder might sue for his bid preparation costs, when: (1) subjective bad faith of the bid procurer deprives a bidder of fair and just consideration of his proposal, (2) there is no reasonable basis for the administrative decision, (3) the discretion allowed is limited, or (4) there is a proven violation of a statute or regulation. (492 F.2d 1200, 1203-04.) Premier alleges subjective bad faith was evidenced by the Board in its failure to evaluate Premier's survey and that all bids submitted were rejected without any reason.

What Premier fails to point out is that the court in *Keco* went on to say:

> "The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid, when that omission amounts to simple negligence, is not a sufficient showing of arbitrary or capricious conduct to warrant recovery of bid preparation expenses." 492 F.2d 1200, 1206-07.

The record does not specifically state why all bids were rejected. At oral argument, the Board's attorney suggested the reason was that Mr. Barnes simply refused to review anything submitted after the original bids were in. In any event, there is no evidence in the record that the Board had an ulterior motive in failing to review Premier's survey. In fact, the Board had awarded contracts to Premier in February, April, and August of that same year. There is no evidence that the sequence of events in this case amount to more than mere negligence. On the other

hand, there is no dispute that a difference of opinion existed as to whether the survey documents were received with the original bid, which could justify the Board's rejection of all bids.

In view of the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.