WILLETT MOTOR COACH CO., Plaintiff-Appellant, *v.* BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 81-1134

■■■■■

Opinion filed December 29, 1981.—Rehearing denied February 23, 1982.

John R. Covington, Richard J. Cochran, and Marc D. Ginsberg, all of Tenney & Bentley, of Chicago, for appellant.

Michael J. Murray, of Chicago (Richard E. Girard and Edward C. Peterson, of counsel), for appellee Board of Education of the City of Chicago.

Thomas N. Todd, of Chicago, for appellees Rapid Transportation, Inc., and Robinson Bus Service, Inc.

Robert S. Atkins and Susan B. Daumer, both of Freeman, Atkins & Coleman, Ltd., of Chicago, for appellees Student Transit Corporation and Northtown Bus Service, Ltd.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Willett Motor Coach Co. (Willett), as a taxpayer, brought an action for injunctive and declaratory relief against the Board of Education of the City of Chicago (Board) and certain bus companies (defendants), which sought: (1) revocation of three-year contracts awarded for transportation of handicapped children attending Chicago public schools, ending August 31, 1983; (2) a requirement that the Board rebid those contracts; and (3) a declaratory judgment holding illegal the bidding procedure on which the subject contracts were predicated, and that all bids received pursuant thereto are null and void. Willett claimed that the Board failed to mail and that it did not receive a "Notice to Bidders" containing an amendment to the Board's original solicitation for bids.

After a bench trial, judgment was entered for the Board and defendants. Willett appeals.

The issue raised for our consideration is whether the trial court's finding that the Board mailed the amendment to Willett was against the manifest weight of the evidence. A corollary issue is whether Willett proved a resultant true loss to general taxpayers as a result of the judgment.

From the evidence it appears that for the past 54 years Willett has provided busing services for the Board, transporting handicapped pupils attending Chicago public schools. On March 12, 1980, the Board solicited bids for contracts to provide 403 vehicles for such transportation. Willett received the solicitation by mail on March 13, 1980. The solicitation required submission of bids no later than 2 p.m. on April 15, 1980, and provided, "this agreement will be subject to cancellation by the Board of Education of the City of Chicago in sixty (60) days' written notice." The solicitation was subsequently amended by two separate notices to bidders, the second of which, not a subject of controversy in this action, was received by Willett. The first amendment ("amendment"), dated March 21, 1980, which Willett claims it did not receive, changed the Board's unilateral cancellation provision contained in the original solicitation to allow that either the Board or any contractor could cancel all obligations on 60 calendar days' notice.

In its second amended complaint Willett alleged that: no notice of said amendment was mailed or communicated to Willett; without the amendment, a successful bidder would be required to perform its obligations for three years; on April 15, 1980, Willett submitted its proposal to the Board without having any knowledge or notice of its amendment; Willett's estimates of possible labor increases and the cost of performance bonds would have been lower had it known of the amendment; consequently, its lack of knowledge placed Willett at an economic disadvantage; and, had Willett received or been aware of the amendment, it would have submitted a proposal to the Board in an amount less than the total amounts bid by the successful bidders.

At trial, Willett presented five witnesses and obtained a stipulation with respect to a sixth witness relative to the asserted lack of receipt of the bilateral cancellation amendment. William J. Merges, assistant director of purchases for the Board, was called by Willett pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). He testified that in 1980 he was responsible for the preparation of bids. To secure the greatest number of qualified bids, they were mailed to all firms on a bidders' list for bus transportation and advertisements were placed in the newspaper. In his opinion, the amendment might have had the effect of causing more bidders to bid on this contract; however, other regulation

changes by the Board may have also had this effect. He did not personally inform Willett of the amendment. Prospective bidders were required to attach the solicitation for bids and amendments to bids to their proposals; however, the notice of the amendment at issue was not attached to Willett's proposal. Bidders could submit either an "all-or-nothing" bid on all 403 buses, or could bid on a lesser quantity on a price per bus per day basis; thus the Board could compare one "all-or-nothing" bid, such as Willett submitted, to an accumulation of smaller bids. The total cost to the Board for the contracts awarded was $36,835,270.56. Merges did not personally mail notices of amendments.

Sharon Tlanda, a secretary employed by Willett, Inc., testified that she was responsible for sorting mail for all of the Willett companies, including Willett, Inc., and Willett Motor Coach Co.[1] during the period in question. Plaintiff's offices were one block away from her own. All mail for plaintiff was placed in a separate box. Mail from the Board was placed in the same box, and ultimately such mail went to William Hood, one of plaintiff's officers. The receptionist, Kathy Pecoraro, also sorted mail. After the morning mail was sorted, someone from Willett, either Hood, Ray Skawski or Greg Bonnett, would pick up Willett's mail. The same routine was followed after the afternoon mail delivery.

It was stipulated that testimony of Kathy Pecoraro would be the same as Tlanda's except with regard to the afternoon mail.

Linda Keating, assistant secretary to the chairman of the board at Willett, Inc., testified that if any mail came from the Board she would inform Hood, and would either hold it until he picked it up or would take it to Willett's mailbox. She forwarded all mail from the Board except checks.

Gregory Bonnett and Raymond J. Skawski, employees of plaintiff, both testified that on occasion they picked up the morning and afternoon mail for plaintiff from Willett, Inc. Unless mail was directed to a specific individual, they brought it to Hood, who also received all mail from the Board.

Andrew Langert, assistant treasurer for Willett, Inc., and vice president of finance for plaintiff, testified that his duties included the preparation of bid proposals submitted to the Board. When he worked on the subject proposal he was not aware of the amendment to the bid solicitation. Plaintiff had submitted two other bids, for two other contracts, to the Board, both of which contained bilateral cancellation provisions. Knowledge of the amendment would have been important in preparing the proposal because if Willett did not have the option to cancel a contract it would have less leverage in negotiating with its drivers' labor

---

[1] Plaintiff Willett Motor Coach Co. is a wholly owned subsidiary of Willett, Inc., which is also the parent corporation of Spears Transportation, Inc.

union, which would in turn affect the cost estimate used in compiling the proposal.

William Hood, vice president of Spears Transportation, formerly vice president of plaintiff, testified that he was responsible for preparation of the subject proposal. He reiterated the routine for retrieving mail contained in previous testimony. Mail from the Board was addressed either to Willett, Inc., or plaintiff. Although he did receive the second amendment, which is not an issue in this lawsuit, he had no knowledge of the subject amendment until April 17, 1980, after bids were submitted, when Merges met with him and Langert and so informed them. The basic bid submitted by plaintiff was $225.84 per day per bus for a Type 1 bus. The "low price" on an alternative bid submitted was $196.74, which applied to a contract providing for older vehicles than those specified by the Board or where municipal bonds were to be used instead of performance bonds. Both were "all-or-nothing" bids. Had Hood had knowledge of the amendment, a bid would have been submitted from $163 to $168 per bus per day.

According to Hood, a subsequent bid submitted in July 1980, containing a mutual cancellation clause, on a contract involving over 300 buses, was $179.27 per day per bus, as the basic bid; an alternative bid of $164.47 per day per bus, for vehicles older than specified; and a second alternative bid of $177.05, in which municipal bonds were proposed instead of performance bonds. Another bid, predicated on a mutual cancellation provision regarding a contract for two buses for students attending O'Hare Airport, was for $225.84. A third bid involving 45 buses for children attending Walt Disney School, again based on a mutual cancellation clause provision, was for $225.84. Hood explained that the fewer buses contemplated in a bid, the higher the bid would be, since expenses would be divided among fewer vehicles.

David W. Howell, chairman of Willett, Inc., stated he had no knowledge of the amendment when bids were submitted and reiterated the ramifications thereof as explained by Hood.

James Watts, data coder for the Board, testified for the Board and defendants. During the time in question he was responsible for running the bids and labels for the Bureau of Purchases from vendor cards listing vendors for bus transportation. The vendor cards were placed in a machine which automatically printed labels therefrom. Cards could not be removed without a specific directive; he never pulled a card on his own initiative. He always counted the labels to make sure they corresponded to the number of vendor cards. The labeling process would also be used for amendments to Board solicitations of bids. After labels were produced, they were counted to ascertain whether they corresponded to the number of vendors on the list. If so, labels were taken by Watts to

personnel to be pasted on envelopes, after which the envelopes were counted and compared to the number of vendor cards, and taken to the mailroom. There, the envelopes are put through a meter stamp machine. He had no specific recollection of having taken any of the steps in the process described above with respect to the amendment at issue, nor could he recall having actually mailed the envelopes. No other witness as to the mailing of the amendment at issue was produced.

The trial court found that too many people at plaintiff or Willett, Inc., handled mail addressed to Willett, so that plaintiff had not proved it had not received the notice of amendment, and denied plaintiff the relief it sought.

Willett argues that the trial court's finding that the amendment was mailed to Willett was against the manifest weight of the evidence. It first maintains that the Board was obliged to mail the amendment to Willett, relying upon sections 34—21.3 and 10—20.21 of the School Code (Ill. Rev. Stat. 1979, ch. 122, pars. 34—21.3 and 10—20.21) and chapter V, section 5—4 of the Rules of the Board, as amended September 28, 1979. The latter section provides, in part:

> "Solicitations of formal bids shall be advertised in a newspaper of general circulation published in the City of Chicago at least 10 days before the bid date, and by such other means that will secure the greatest number of qualified proposals * * *."

Willett asserts that the mailing of the notice of amendment constituted the "other means" specified, and that compliance with rules regarding competitive bidding, such as section 5—4, is a prerequisite to the formation of a valid contract between the Board and a successful bidder. As authority for this latter principle Willett cites *Premier Electrical Construction Co. v. Board of Education* (1979), 70 Ill. App. 3d 866, 871, 388 N.E.2d 1088. In that case a bidder who had not complied with certain statutory requirements for bidding attempted unsuccessfully to assert a contract between the Board and itself. Willett urges that here the evidence failed to demonstrate that the amendment was mailed to it; the Board, therefore, did not comply with its own rule, thereby denying to Willett an opportunity to submit a competitive proposal.

Willett insists that no evidence was presented by the Board that the amendment was mailed or even sent to the bid solicitation section for mailing; rather, evidence was presented only as to customary mailing procedures. It cites cases for the principle that although the mailing of a properly stamped and addressed letter raises the presumption the letter was received by the addressee, denial of receipt rebuts the presumption and receipt then becomes a question to be resolved by the trier of fact. Moreover, proof of customary practices regarding mailing procedures is insufficient to establish the mailing of a specific item and thereby raise the

presumption. Among those cases are *Meyer v. Krug* (1939), 298 Ill. App. 625, 19 N.E.2d 111; *State Bank v. Standaert* (1948), 335 Ill. App. 519, 82 N.E.2d 393; *M. S. Kaplan Co. v. Cullerton* (1977), 49 Ill. App. 3d 374, 364 N.E.2d 381; and *Lynn v. Village of West City* (1976), 36 Ill. App. 3d 561, 345 N.E.2d 172.

The Board and other defendants seek to distinguish the foregoing authorities on several grounds. First, they argue that in those cases the proof of mailing was a statutory or contractual condition precedent to a party's right of recovery or relief, in other words, that it was plaintiff's burden in each case to prove mailing; and that mailing was a condition precedent to recovery. Here, they assert, the action was not brought by the party whose responsibility it was to prove mailing. We disagree. In *M. S. Kaplan Co. v. Cullerton*, an attempt was made to prove mailing of notice of a hearing regarding increased valuation of plaintiff's property through evidence of records indicating the notice was prepared for mailing. Plaintiff sought to enjoin defendant from collecting taxes, claiming he had not received notice of a hearing. Plaintiff there, as here, alleged lack of receipt of notice, and the tax based upon the increased assessment was held void in the absence of evidence from the assessor that the notice of hearing was actually and timely mailed to plaintiff.

The Board and other defendants also claim that in the cases above-cited, as opposed to the case at bar, there was a statutory or contractual duty to mail the item in question and maintain that there is no such requirement here that the amendment be mailed. They thereby suggest either that the provisions of chapter V, section 5—4 do not necessitate a mailing, or that they do not apply to a notice of amendment. Merges, the Board's assistant director of purchases, testified, however, that the language of section 5—4, "* * * such other means that will serve the greatest number of qualified proposals," meant mailing to all the firms on the regular bidders' list. He also stated that the same Board unit, the bid solicitation department, had the responsibility of mailing both the original bids and the notices of amendment. To hold that the Board was required to mail the original bids to all potential bidders, but that it was unnecessary to advise those bidders of substantive amendments to the requirements would be a mockery of the bidding process which "* * * necessarily implies equal opportunity to and freedom in all whose interests or inclinations might thus impel them to compete at the bidding." *Dement v. Rokker* (1888), 126 Ill. 174, 196, 19 N.E. 33.

The Board and other defendants would distinguish the cited cases from the instant case in that none of those cited involved a mass mailing; therefore, they seek a more lenient standard of proof here. Although none of the cases cited expressly refer to a mass mailing, it is clear that some involved mailings which were not unique in character and at least one, in

all probability, occurred on a large scale, *e.g., M. S. Kaplan Co. v. Cullerton,* which was concerned with tax collection procedures indubitably followed on a county-wide basis.

Appellees contend that, although the cases cited hold that mere proof of custom and practice regarding mailing is insufficient proof of the fact that a particular item was mailed, in the instant case there was more evidence of mailing adduced than that of business procedures. They suggest that because there is evidence that Willett received both the first solicitation of bids and the second amendment, the presumption is raised that Willett received the first amendment, citing a breach of contract case, *Tabor & Co. v. Gorenz* (1976), 43 Ill. App. 3d 124, 130, 356 N.E.2d 1150, in which defendants there denied receipt of a confirmation of an oral agreement sent by plaintiff. In *Tabor,* however, corroborating evidence, in addition to proof of office custom as to preparation, addressing, stamping and mailing of contract confirmations, was adduced, including: copies of the confirmation of contract forms sent to defendant; receipt by defendant of other mailings close in time to the transaction in question; defendant's failure to complain about previous deliveries which were made in accordance with the disputed oral contract; and failure of defendant to keep accurate records of its business transactions. In contrast here, no evidence was presented by the Board that its mailing procedures were actually followed in the instance of the first amendment to bidding procedures under consideration. There was nothing to show that the amendment was mailed to any bidder on the list, whether to Willett or some other entity. The fact that several such notices of amendment were attached to submitted bids does not lead to the inference that they were received by mail; these bidders were also defendants in this case who could have easily supplied evidence at trial that they had received the notices of amendment by mail, and thereby filled this hiatus in proof that existed in the Board's case. Under this state of the record, *Tabor* offers little support to defendants' position.

Appellees further assert that evidence adduced by Willett failed to establish that it did not receive the notice of amendment, since several individuals handled the mail and delivered it from Willett, Inc., to plaintiff Willett Motor Coach Co.; mail from the Board was sometimes addressed to Willett, Inc., and sometimes to Willett Motor Coach; and there is no certainty that mail sent by the Board was not mishandled or lost by plaintiff's employees. They also point out that the labels in evidence bear the name Willett, Inc., instead of plaintiff Willett Motor Coach Co. Evidence that neither corporation received the first amendment to bidding procedures was presented by plaintiff, however, including testimony by officers of both corporations, two mail sorters and three mail delivery people, which has already been described earlier in this

opinion and need not be repeated here. That evidence related to every person in either corporation that would have had any contact with such mail.

■■ ■ A chancellor's decree, based upon testimony given before him during trial, will not be reversed unless palpably contrary to the manifest weight of the evidence; however, where upon examination of the entire record, it appears that the decree cannot be justified by the record, it must be reversed. (*Stephenson v. Kulichek* (1951), 410 Ill. 139, 147, 101 N.E.2d 542; *Goldblatt Bros., Inc. v. Addison Green Meadows, Inc.* (1972), 8 Ill. App. 3d 490, 499, 290 N.E.2d 715; *Liddell v. Smith* (1965), 65 Ill. App. 2d 352, 357, 213 N.E.2d 604.) In the case before us, when Willett's evidence of lack of receipt is considered in contraposition to defendant's lack of evidence showing that the amendment to bid was actually mailed to anyone, we are forced to conclude that the chancellor's conclusion was palpably contrary to the manifest weight of the evidence and must be reversed.

■■ Appellees rely on cases which hold that in awarding a contract to the "lowest responsible bidder" for competitively bid contracts, public bodies have broad discretion with which courts will not interfere in the absence of fraud, and there is a presumption that the action of authorities in awarding contracts is regular and lawful. (*Kelly v. City of Chicago* (1871), 62 Ill. 279; *People v. Kent* (1896), 160 Ill. 655, 43 N.E. 760; *Johnson v. Sanitary District* (1896), 163 Ill. 285, 45 N.E. 213; *Hallett v. City of Elgin* (1912), 254 Ill. 343, 98 N.E. 530; *People ex rel. Peterson v. Omen* (1919), 290 Ill. 59, 124 N.E. 860.) In none of those cases, however, was it claimed by an unsuccessful bidder, as in the instant case, that a substantive amendment to bidding requirements which could have affected the bid amount, was not sent to, or received by, an interested bidder in the same manner as the solicitation for bid was sent. Appellees claim further that actions of public officials are presumed honest and regular, citing cases in which the honesty of public officials was in issue. (*Smith v. Board of Education* (1950), 405 Ill. 143, 89 N.E.2d 893; *Tribune Co. v. Thompson* (1930), 342 Ill. 503, 174 N.E. 561; *Panozzo v. City of Rockford* (1940), 306 Ill. App. 443, 28 N.E.2d 748.) Those cases weigh allegations of conspiracy and fraud charged against public officials, and motivation underlying their official acts. Here, Willett makes no charge of dishonesty; the thrust of this appeal is whether there was sufficient proof offered by the Board to link its regular solicitation for bid mailing procedures to the dissemination of the amendment to bid.

■■ Appellees further argue that Willett has not demonstrated that if it had known about the amendment, it would have bid lower than other bidders. At the outset of our consideration of this contention, it may be observed that no finding was made by the chancellor in this aspect of the

case; he did, however, deny appellees' motion for judgment at the close of Willett's proof on this point. No countervailing evidence was offered by appellees in this regard. We also note that evidence of what one "would have done" under circumstances other than those which actually obtained, necessarily partakes of some measure of speculation. Nevertheless, Willett assumed the posture of a taxpayer and, therefore, was obligated to prove that the action of the Board resulted in a true loss to the general taxpayer, which requires some measure of this type of evidence. *Barrett v. City of Chicago* (1956), 11 Ill. App. 2d 146, 154, 136 N.E.2d 564; *People ex rel. Hamer v. Board of Education* (1974), 22 Ill. App. 3d 130, 135, 316 N.E.2d 820; *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 749-50, 359 N.E.2d 1137.

The Board's solicitation permitted bids to be submitted for all or any part of the required 403 buses. Willett was the only single bidder for all the buses. The award was made to 12 different bus companies. Their bids ranged from $134 per bus per day to $255.84 per bus per day. Hood, an officer who was, in part, responsible for the preparation of Willett's bid submission, testified that had Willett known of the bid solicitation amendment providing for a 60-day bilateral cancellation clause, it would have bid from $163 to $168 per day per bus. Hood explained the basis for that statement. Willett was experiencing the highest labor costs in the city for its type of operation, necessarily a factor in the bid price. In order to remain competitive and in business, those costs had to be lowered; this, in turn, would lower the bid price. At the time of the bidding, Willett was in the midst of labor negotiations with its drivers' union, and the 60-day cancellation clause would have provided Willett with necessary leverage in those discussions. Howell, chairman of Willett, Inc., the parent corporation, testified that he had assisted in the preparation of Willett's bid. He explained that in the absence of the 60-day bilateral cancellation clause, Willett had no leverage with which to bargain with its union. The possibility of a strike under those circumstances would have increased the cost of a performance bond. With the cancellation clause, Willett could risk submitting a low bid and use the lower figure to negotiate a satisfactory wage agreement. Another factor that would have been considered was that the bilateral cancellation clause encouraged bids from many bidders who were unable to obtain performance bonds for a 3-year contract, which would have constituted an added incentive for submitting a lower bid. The 60-day cancellation clause required a bond that guaranteed no more than 60 days performance. Had Willett known this, it would have also known that it would have to bid lower to get the contract.

The savings to the Board and general taxpayers if Willett's bid had been at the $163 to $168 per day per bus figure would have been substantial. Taking the higher figure of $168 per bus and multiplying by

403 buses, and then that product, $67,704, by the 528 days of contract duration, the final product is $35,747,712, or $1,087,558 less than the total cost to the Board of $36,835,270 by virtue of its acceptance of defendant's bids. Such a savings would have been sufficient to satisfy the necessary showing in a taxpayer suit such as this that a true loss to the general taxpayer had been incurred by virtue of the Board's procedures, or lack thereof, here.[2]

From our consideration of the entire record, we are compelled to reverse the judgment denying Willett's prayer for injunctive and declaratory relief, and remand to the circuit court of Cook County for entry of orders prayed for in Willett's second amended complaint.

Reversed and remanded.

DOWNING and PERLIN, JJ., concur.

---

[2] We may not indulge in speculation as to whether rebidding of these contracts will meet or exceed, by virtue of inflation, the amounts previously bid in April of 1980.